[S. F. No. 15107. In Bank.—April 26, 1935.]

B. FROSS, Plaintiff, v. A. D. WOTTON et al., Respondents; FRANK A. RETHERS, as Trustee in Bankruptcy, etc., Intervener and Appellant.

Torregano & Stark, A. B. Kreft and August B. Rothchild for Appellant.

Phillip Barnett and Samuel Vartan for Respondents.

THOMPSON, J.—During August, 1929, the defendants A. D. Wotton and Maude Wotton, his wife, gave to Louis Greenwald, in connection with the purchase of certain real property in Glenn County, their promissory note for $12,500, dated August 27, 1929, and secured by a trust deed on the purchased property. On January 11, 1930, notice of default and election to sell under the trust deed was given by the trustee. On February 21, 1930, the Wottons conveyed to the defendant Osca A. Peach, who is a sister of A. D. Wotton, four parcels of land in Santa Clara, San Francisco and Marin Counties and, on the same day, declared a homestead on their one remaining piece of real property on Irving Street in San Francisco. Sale was had under the trust deed on May 12, 1930, and Greenwald repurchased for about $1500, assigning his interest in the note to B. Fross, plaintiff in this action, on May 15, 1930. Fross commenced action on the note on May 17, 1930, and recovered a deficiency judgment on March 10, 1931, for $12,239.36 plus interest and costs. On June 1, 1931, Fross instituted this action to set aside the four conveyances to Mrs. Peach as having been made in fraud of creditors. On June 16, 1931, the Wottons were adjudged bankrupts on voluntary petition, Fross filing the only substantial claim in the bankruptcy proceeding. A complaint in intervention was filed by Frank A. Rethers, trustee in bankruptcy of the estate of A. D. Wotton. The defendants A. D. and Maude Wotton defaulted. From a judgment of nonsuit granted on motion of the defendant Osca A. Peach, the intervening trustee in bankruptcy prosecutes this appeal.

It is the contention of the appellant that the proof has shown, not only a conveyance conclusively presumed to be fraudulent under section 3442 of the Civil Code, but an actual intent on the part of A. D. Wotton to hinder, delay and defraud his creditors by means of the conveyances attacked.

Respondent contends that there is a complete absence of proof that the grantors conveyed the property with intent

to hinder, delay or defraud the plaintiff and that, conceding the sufficiency of appellant's evidence in all other respects, the ruling of the trial court granting the nonsuit must be sustained because of the failure to show that the security for the note was insufficient at the time of the conveyances sought to be set aside. Respondent cites in support of this contention, *Norton* v. *Blenkiron,* 138 Cal. App. 66 [31 Pac. (2d) 807], *McMillan* v. *McMillan,* 42 Idaho, 270 [245 Pac. 98], and *Polk County Nat. Bank* v. *Scott,* 132 Fed. 897.

We do not regard the failure of appellant to show that the security was insufficient to satisfy the debt at the time of the conveyances as fatal to his case, nor do we think the cited cases so hold. In *Norton* v. *Blenkiron, supra,* the defendant conveyed practically all his remaining property to his sister pending a foreclosure action, a deficiency judgment was returned unsatisfied and the conveyances to the sister were attacked as fraudulent, plaintiff relying upon section 3442 of the Civil Code, which provides that "any transfer or encumbrance of property made or given voluntarily, or without a valuable consideration, by a party while insolvent or in contemplation of insolvency, shall be fraudulent, and void as to existing creditors", and making no attempt to prove an actual fraudulent intent. It was there held that the plaintiff, being a secured creditor, had not established his right to have the conveyances set aside as fraudulent without a showing that his indebtedness was not fully secured. The defendant had in fact testified that the market value of the property was greater than the debt it secured. That case cites and relies upon *McMillan* v. *McMillan,* also *supra,* in which it was held that it was not sufficient for the secured creditor seeking to set aside as fraudulent a gift from the debtor to his wife, to merely show the debt, the voluntary transfer and the subsequent foreclosure and deficiency judgment, but that "evidence is required from which an intent to defraud may be inferred", and the transfer was not fraudulent if the husband had sufficient remaining property to pay his debt and the defendant was put to no necessity to prove its sufficiency when the gift was made in the absence of a showing that the property mortgaged was not sufficient. In *Polk County Nat. Bank* v. *Scott, supra,* it was held that a voluntary conveyance to the debtor's wife was not presumptively fraudulent

where the only debt he owed at the time was fully secured. Here also there was no proof of actual fraud offered. In *Craig* v. *Partridge*, 48 Idaho, 471 [282 Pac. 940], cited in the Blenkiron case, the evidence was held to support a finding that the conveyance was not fraudulent where there was no evidence that the land mortgaged to the creditor was not ample security for the loan, and the inference was that the creditor so considered it, the default taking place in 1923, the conveyance to the wife in 1924 and action for foreclosure not having been begun until 1926.

The most these cases can be said to hold is that where there is no other evidence to show a fraudulent intent in making the conveyance complained of, or where reliance is placed upon a presumption of fraud from the making of a voluntary conveyance during or in contemplation of insolvency, as in *Norton* v. *Blenkiron, supra,* and the only debt is a secured debt, the security must be shown to be insufficient to meet the obligation at the time the conveyance is made. ▮ We understand the true rule to be that amply secured debts are not to be taken into consideration for the purpose of determining whether the financial condition of the grantor renders the conveyance presumptively fraudulent as to existing creditors, but that when actual fraud is charged the sufficiency of the security at the time of the conveyance is important only as evidencing the existence or nonexistence of a fraudulent intent. ▮ This is in accordance with the long-established rule in this state that where there is actual fraud it is immaterial that the debtor does not entirely strip himself of his assets and there is other property from which the creditor may be satisfied. In *First Nat. Bank* v. *Maxwell*, 123 Cal. 369 [55 Pac. 980, 69 Am. St. Rep. 64], it was found that, in addition to the property covered by the deed of trust which it was sought to have set aside, the debtor owned real estate aggregating several thousand dollars over encumbrances and unencumbered personalty worth between five and six thousand dollars. The court said, at page 372 [123 Cal.]: ''This is not a finding that the trust deed was not made to delay and defraud creditors though competent as evidence tending in some measure toward that conclusion, though far from being in itself conclusive. In Bigelow on Fraud, volume 2, page 383, is it said: 'Indeed, it matters not, where personal intent to defraud is shown, that

the fraudulent conveyance, if allowed to stand, would not harm anyone, by reason of the fact that the debtor has other property ample in amount within the reach of his creditors; and in *Hager* v. *Shindler*, 29 Cal. [47], 60, it was said: 'A rich man may make a fraudulent deed as well as one who is insolvent.' (See, also, *Bull* v. *Bray*, 89 Cal. [286] 300 [26 Pac. 873, 13 L. R. A. 576].)

"There can be no question, upon the evidence appearing in the record, that there was on the part of the grantor such personal intent to defraud, and the facts stated in said finding do not overcome that evidence; and besides, it is a finding of probative facts merely, and not of the fact of fraudulent intent or its opposite."

In *Vogel* v. *Sheridan*, 4 Cal. App. (2d) 298 [40 Pac. (2d) 946] (hearing denied by this court April 1, 1935), after holding that the evidence would support a finding that the conveyances were "voluntary transfers made with the fixed intent and purpose of delaying and defrauding creditors and that Mrs. Sheridan accepted these transfers with full knowledge of such intent and purpose", the court said: "Appellants contend that (the) findings are deprived of support because the corporation was solvent . . . when the transfers . . . were made to Mrs. Sheridan. In this connection, it may be stated that the corporate books were not all before the court and it is not possible to ascertain definitely whether the corporation was solvent or insolvent at the time said transfers were made. This action, however, may be sustained under section 3439 of the Civil Code regardless of the question of solvency as the evidence was sufficient to show an actual intent to delay and defraud creditors. Such intent invalidates the transaction as against creditors even though the debtor is not entirely stripped of assets and may still have sufficient property after such transfers to satisfy his creditors. (*Title Ins. etc. Co.* v. *California Dev. Co.*, 171 Cal. 173 (see page 213) [152 Pac. 542]; *First Nat. Bank of L. A.* v. *Maxwell*, 123 Cal. 360 [55 Pac. 980, 69 Am. St. Rep. 64]; *Alpha H. & S. Co.* v. *Ruby Mines Co.*, 97 Cal. App. 508 [275 Pac. 984]; *Benson* v. *Harriman*, 55 Cal. App. 483 [204 Pac. 255]; *Johns* v. *Baender*, 40 Cal. App. 790 [182 Pac. 55]; *Bekins* v. *Dieterle*, 5 Cal. App. 690 [91 Pac. 173]; 12 Cal. Jur., pp. 976, 977.) It is only in actions maintained under the proviso in section 3442 that

the insolvency of the transferror becomes of controlling importance and in such actions, the question of actual intent becomes immaterial. The distinction is pointed out in *Hanscomb-James-Winship* v. *Ainger,* 71 Cal. App. 735 [236 Pac. 325], and *Allee* v. *Shay,* 92 Cal. App. 749 [268 Pac. 962]. It has been stated that both sections should be liberally construed to effect their purpose which 'undoubtedly is to prevent debtors from placing property which legitimately should be available for the satisfaction of demands of creditors beyond their reach'. (*Borgfeldt* v. *Curry,* 25 Cal. App. 624, 626 [144 Pac. 976].) "

In other words, the question of fraudulent intent is always one of fact, but where, at the time of the transfer, the grantor is insolvent, section 3442 of the Civil Code supplies the rule that the conveyance shall be deemed fraudulent, otherwise the fact is to be proven under section 3439 of the Civil Code.

Under the rule of *Norton* v. *Blenkiron, supra,* and the views expressed above, the failure of the appellant to make a showing of the insufficiency of the security at the time of the conveyances to Mrs. Peach is fatal to his contention that he has made out a case under section 3442 of the Civil Code. It remains, however, to determine whether there has been made out, by other evidence, a *prima facie* case of an actual intent to defraud the plaintiff by putting beyond his reach all other assets to which he was entitled to resort to satisfy a deficiency judgment for the balance remaining due on his note after exhaustion of the security.

When called as witnesses under section 2055 of the Code of Civil Procedure, A. D. Wotton, Maude Wotton and Osca A. Peach, the grantee, all refused to testify on the ground that their answers might tend to incriminate them and subject them to a criminal prosecution for defrauding creditors, replying to practically all questions addressed to them with a claim of privilege under section 2065 of the Code of Civil Procedure. Consequently the record is composed of exhibits introduced by the intervener, consisting of copies of documents in the bankruptcy proceeding, the note sued on, the notice of default and election to sell, the abstract of the deficiency judgment, the deeds to Osca A. Peach from A. D. Wotton and the declaration of homestead, all dated February 21, 1930, the deeds of the Santa Clara and Marin County and one of the San Francisco properties to A. D.

Wotton from his predecessors in interest, dated respectively October 22, 1929, October 21, 1929, and October 5, 1910, and portions of the testimony given by A. D. Wotton at a referee's hearing in San Francisco on August 25, 1931, and by Osca A. Peach at proceedings before a referee in San Diego on March 25, 1933, introduced as admissions against interest.

In substance Wotton testified that in February of 1930 he transferred to his sister, Mrs. Peach, the properties above mentioned, that he had two other pieces of property in San Francisco which he traded about the same time, that they were encumbered for more than they were worth and that after all these various deals, starting with 1929 and ending with February, 1930, he was broke. Counsel for appellant places great stress upon the fact that in giving this evidence Wotton said that he "gave" the property to Mrs. Peach. However this expression appears to have been carelessly used and to be without great significance.

Mrs. Peach's testimony was inconsistent and evasive and is correspondingly difficult to summarize but, in brief, her story is that between 1920 and 1926 she loaned Wotton, or gave him to invest for her and for safekeeping, between $3,000 and $6,000. It was all in cash, except for about $100 in traveler's checks, despite the fact that she had bank accounts at the time and she lived in San Diego and Wotton in San Francisco. All the money she gave her brother came from the east by way of postal money orders, telegraph or traveler's checks. No records were kept or they have since been destroyed, and Mrs. Peach was unable to say how she arrived at the stated amount of $6,000 or upon what basis she estimated it at that. She testified that Wotton told her he had invested her money in a place in Mill Valley (but she did not know whether he purchased it or loaned money on it) and in "some lots in different places—some in Santa Clara County" and because she needed money and to even up her accounts with him, he conveyed the Marin, Santa Clara and San Francisco property to her in 1926. (It should be noted here that the Santa Clara and Marin County properties were not acquired by Wotton until 1929 and that all the deeds from Wotton to Mrs. Peach were dated February, 1930.) She further testified that after the conveyances to her she got no money out of the property, left her deeds with her attorney, got no reports from

Wotton, received no rent, paid no taxes, knew nothing about the condition of the properties, whether rented or encumbered, except for a memorandum on the back of a calling card, used by her to refresh her memory, which she said was made by herself at the time she received the deeds, and which had written thereon "Mill Valley property mortgage $1500—$2000 Tamalpais Investment Company $37 ⅓ mo. 6 lots in San Francisco 4041 Irving Street." After this the word "lives" had been written and erased, then the date, "Feb. 1930". The witness did not know where she got this information but insisted the memorandum was made at the time she got the deed to the Mill Valley property and her brother may have told her about the mortgage later. She testified she had some conversation with her brother in 1930 in regard to this indebtedness and that some papers, some deeds, were sent her, but when asked by whom they were sent she claimed her constitutional privilege and refused to answer. Prior thereto she had testified that her brother had told her in 1930 that he was losing money in "some kind of a deal"; that this was the last time she saw him, in May, 1930.

The evidence is most unsatisfactory but there are present a number of factors from which it can reasonably be inferred that the four conveyances attacked were not a part of a *bona fide* transaction but were executed for the purpose of putting the property which was the subject thereof beyond the reach of the plaintiff, among them the following: the fact that the deeds were executed little more than a month after the notice of default and election to sell under the trust deed, and the declaration of homestead upon the grantor's one remaining piece of property on the same day, amounting to a disposal of his entire available property at a time when he could well have been anticipating the entry of a judgment against him, the continued exercise of dominion and control by the grantor over the property after the conveyance and the grantee's total lack of knowledge or information concerning the property, the absence of any accounting to her either for receipts from or disbursements on account of the property, her own admission that she gave no authorizations, directions or instructions to her brother as to his handling of her property or the investing of her money and, finally, a mistake of four years as to the time of the transfer, placing it prior to the time Wotton acquired

a large part of it, coupled with an almost incredible account of the consideration for the deeds and the close relationship of the parties.

From the very nature of the action direct proof of the fraudulent intent of the parties is an impossibility. For this reason and because the real intent of the parties and the facts of the transactions are peculiarly within the knowledge of those sought to be charged with the fraud, proof indicative of fraud must come by inference from the circumstances surrounding the transaction, the relationship and interests of the parties. (*Moore* v. *McDonald*, 122 Cal. App. 61, 69 [9 Pac. (2d) 556], and cases cited.) The inference of fraud from the irregularities of the instant transaction is reasonable, particularly in view of the refusal of all of the parties thereto to testify upon the ground that their answers would tend to incriminate them.

We are here met by the argument that it is a violation of the constitutional privilege to draw an inference from the refusal to testify when put upon the ground of the privilege against self-incrimination. However, we do not think the inference here drawn constitutes a denial or invasion of that privilege.

The California Constitution provides, in article I, section 13, that no person shall "be compelled, in any criminal case, to be a witness against himself". This privilege is reaffirmed in the Penal Code, sections 688 and 1323, and it is no longer questioned that it protects the ordinary witness in civil proceedings from a disclosure which would tend to subject him to a criminal liability. The privilege of the witness in a civil case, who is compellable to take the stand, is to refuse to answer those specific questions put to him which would if answered disclose facts which would tend to prove his guilt. (Code Civ. Proc., sec. 2065.) Prohibition of comment upon and an inference of guilt from the defendant's silence or failure to take the stand has been held to be inherent in the constitutional privilege for the reason that, were the rule otherwise, the defendant would, as a practical matter, be furnishing proof against himself by the mere exercise of his privilege. (*People* v. *Tyler*, 36 Cal. 522.) This was the state of the law at the time the instant case was tried. However, in November, 1934, an amendment to section 13 of article I of the Constitution was adopted, providing that, in any criminal case, "whether the defendant

testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or jury''.

Concerning privilege in general which excuses the giving of testimony, it is said in Wigmore on Evidence, second edition, volume 4, page 659, section 2196: ''The grounds for exemption from the testimonial duty are entirely extrinsic to the purpose of ascertaining the truth ' (*ante,* section 2175). They are based on a policy of dispensing with the compulsion of attendance and disclosure wherever it is not necessary, or is more disadvantageous in respect to other interests of the community (*ante,* section 2192). The exemptions are therefore in no sense provided for the *benefit of the party* whose opponent is deprived by them of the evidence which he desires. They are not intended to secure for him a better likelihood of demonstrating the truth of his cause; on the contrary, they constitute so many obstacles to the ascertainment of the truth, and these are suffered only because the several extrinsic policies are deemed to be in these respects paramount to. the purpose of ascertaining the truth.''

The historical background of the privilege against self-incrimination provides the key to its purpose and scope. It is an outgrowth of and a protest against the compulsory self-incrimination, torture and inquisition of the early English courts. (Wigmore, 2d ed., vol. 4, secs. 2250, 2251; Andrew A. Bruce, 31 Mich. L. Rev. 226; Wartells and Pollitt, 18 Ky. L. J. 18.) Rather than in excessive tenderness for the criminal, the reason for the rule is to be found in the protection of the innocent by preventing, as far as possible, conviction upon forced confessions. ''The truth is that the privilege exists for the sake of the innocent—or at least for reasons irrespective of the guilt of the accused. . . . The real objection is that *any system of administration which permits the prosecution to trust habitually to compulsory self-disclosure as a source of proof must itself suffer morally thereby.* The inclination develops to rely mainly upon such evidence, and to be satisfied with an incomplete investigation of the other sources. The exercise of the power to extract answers begets a forgetfulness of the just limitations of that power.'' (Wigmore, 2d ed., vol. 4, p. 824, sec. 2251.)

The rule that no inference must be drawn from the claim of the privilege is a rule of policy and conflicts with the inference which normally arises from the suppression of evidence by the party in control of it. The prohibition of the inference which logically flows from the claim of privilege is not based upon any lack of probative value in the inference itself but upon the fear of destroying the privilege. Hence all other inferences except that of the guilt of the defendant would logically seem to remain in force. (See Wigmore, 2d ed., vol. 4, sec. 2272.)

In a civil case the claim of privilege on this ground may not necessarily give rise to an inference which is relevant to the issues involved. But here the claim of privilege is based upon the very fact in issue, the only excuse for silence is that an explanation of the real nature of the transaction would disclose conveyances made in fraud of creditors. The inference that the conveyances were not *bona fide* is inescapable, nor can we see that it is necessary to ignore it in order to preserve the constitutional privilege of the witnesses. The privilege is not for the benefit of the guilty nor to enable the claimant to prevail in civil suits by means of it. The privilege is to be protected from compulsory disclosure of criminal liability or facts connecting the claimant with the crime. (See *In re Berman*, 105 Cal. App. 37 [287 Pac. 126]). To hold that no inference could be drawn from the refusal of these witnesses to explain their dealings, in the face of so many suspicious circumstances, would be an unjustifiable extension of the privilege for a purpose it was never intended to fulfill.

While it is true that some authorities would seem to indicate that the contrary rule should be applied, we find support for what we consider to be the more just and salutary conclusion in such cases as *Andrews* v. *Frye*, 104 Mass. 234, *Fellows* v. *Wilson*, 31 Barb. (N. Y.) 162, and *Morris* v. *McClellan*, 154 Ala. 639 [45 So. 641, Ann. Cas. 305].

The judgment is reversed.

Preston, J., Curtis, J., Shenk, J., and Waste, C. J., concurred.