[Civ. No. 24242. Second Dist., Div. One. Aug. 4, 1960.]

HARRY SLATER, as Executor, etc., Respondent, v. RUTH BIELSKY et al., Appellants.

524

Paul Pearlin for Appellants.

Walter B. Gieselman for Respondent.

LILLIE, J.—Plaintiff, surviving husband of Mary Slater, deceased, sued her estate and her incompetent daughter, Rena

Wolfson (a child of a prior marriage), to set aside certain deeds he had executed to his wife during her lifetime and a purported gift of community property. His first cause of action alleged that a deed dated November 8, 1948, transferring to her as her separate property a lot on Brooks Avenue, was given by him upon her fraudulent representation that plaintiff should convey it to her to protect them from possible claims of creditors, and that it would still remain community property and on her death he would inherit the same free of cost of probate and taxes; the second charged that on February 2, 1944, he executed a deed in both of their names to a lot on Avenue 19 as community property and that the deed was procured from him through her fraudulent representation that upon the death of either the property would automatically go to the survivor without cost of probate and taxes; and the third cause of action was to set aside as to one-half, certain savings bonds that, unknown to him and without his consent, were purchased by the deceased during their married life with community funds and placed either in her name alone or in her name and that of Rena Wolfson, as joint tenants. The matter was heard by a jury which returned a special verdict in favor of plaintiff, upon which the court settled findings.

The court found that a confidential relationship existed between plaintiff and decedent as husband and wife; that as to the first cause of action, the Brooks Avenue property "was not transferred to plaintiff's deceased wife by the plaintiff to defraud creditors" but that decedent fraudulently induced plaintiff to deed the same to her as her separate property by representing to him that upon her death the property would become plaintiff's; that with reference to the second cause of action, the consent of plaintiff to transfer the Avenue 19 property to their names "without being in joint tenancy" was obtained through the exercise of fraud upon him by decedent; and in connection with the third, the court found that certain United States savings bonds were purchased by the decedent from community funds which were held without consent of plaintiff in her name alone and in the names of decedent and Rena Wolfson. Judgment was entered on the findings cancelling the deeds of November 8, 1948, and February 2, 1944, and adjudicating all of the United States savings bonds as community property. Defendants appeal from the judgment contending that the findings are not supported by the evidence, particularly with reference to—the transfer of the Brooks Avenue property to protect the parties from creditors' claims,

the transfer of the Avenue 19 property in reliance on decedent's false representations, and the status of the funds from which the United States savings bonds were purchased by decedent.

Predicating their first claim of error—that the evidence does not support the lower court's finding that the Brooks Avenue property was not transferred to plaintiff to defraud creditors—upon plaintiff's testimony that in 1948 his furniture business needed money and decedent suggested he transfer the property to her for "convenience sake," and the testimony of Jean Finn that plaintiff thought her suggestion that he transfer the property to his wife "in the event any creditor went after" him, was a good idea, appellants argue that the evidence of fraud is clear and the general rule that a conveyance in fraud of creditors vests title to the property transferred in the grantee except as against the creditors of the grantor (*Estate of Xydias,* 92 Cal.App.2d 857 [208 P.2d 378]; *Ramirez* v. *Hartford Acc. & Indem. Co.,* 29 Cal.App.2d 193 [84 P.2d 172]; *Tognazzi* v. *Wilhelm,* 6 Cal.2d 123 [56 P.2d 1227]) applies.

It is not clear from appellants' brief what kind of fraudulent conveyance with relation to creditors they claim exists. In most cases, actual intent to defraud creditors must be proved (Civ. Code, § 3439.07) which, because of difficulty of direct proof, consists of inferences from circumstances surrounding the transaction and the relationship and interests of the parties; solvency is not material if the intent of the debtor to hinder or delay creditors is shown (*Fross* v. *Wotton,* 3 Cal. 2d 384 [44 P.2d 350]; *Maguire* v. *Corbett,* 119 Cal.App.2d 244 [259 P.2d 507]). However, a transfer without a fair consideration by an insolvent person, or one who will thereby be rendered insolvent, is fraudulent as to creditors without regard to his actual intent to defraud (Civ. Code, § 3439.04), in which case insolvency is not only material but defined in section 3439.02, Civil Code. Other types of fraudulent conveyances recognized by statute include transfers made by one engaged in a business for which his remaining capital is "unreasonably small" (Civ. Code, § 3439.02), or when the transferor intends to, or believes, that he will incur debts beyond his ability to pay as they mature (Civ. Code, § 3439.06). Appellants have failed to develop their argument beyond advancing the application of the general rule that a transfer in fraud of creditors binds the transferor. However, the record before us contains no evidence of insolvency of plaintiff as defined in section

3439.02, or near insolvency, or that plaintiff intended to hinder or delay creditors or indeed that he even had any creditors. Plaintiff's mere acknowledgment at the trial that "we had to have some money for the furniture business" is far removed from any inference that plaintiff's financial status in 1948 was any less than sound, or that his remaining capital after the transfer would be unreasonably small or that he would incur debts beyond his ability to pay as they mature; in fact, it appears that his need for funds was not only not pressing but whenever plaintiff asked his wife for money she gave it to him from time to time from their bank account, which always seemed to produce available funds. Nor does the fact that they had to "have some money" for the business appear to have much bearing on any intent to defraud creditors, for it is clear from the plaintiff's testimony that his wife at previous times when requested, gave him money from the community funds for the business, and then she suggested "(S)upposing you turn over the property to me for convenience sake, . . ." What the plaintiff or his wife meant by the term "convenience" has not been explained, but from her then already established practice of taking care of the finances, banking the money, investing the funds and paying all obligations, and from her statements to plaintiff relative to this and other property, that, in transferring the same to her, upon the death of either the survivor would be saved "a lot of trouble to get . . . the other one-half ownership" and the necessity of going to court and paying taxes and costs, it is reasonable to assume that plaintiff, inspired by her suggestions and representations, believed that the execution of such a deed would be a convenient method of taking care of the property and avoiding the expenses of probate. This, too, no doubt, is what decedent wanted plaintiff to believe, for the record bespeaks her real undisclosed reason for soliciting the transfers from plaintiff— to accumulate in her name as much of their property as she could to care for her daughter upon her death.

The question of intent on the part of the grantor which makes a conveyance in fraud of creditors void, is one for the trier of the fact (*Knapp* v. *Elliott*, 81 Cal.App.2d 667 [184 P.2d 934]; *Fross* v. *Wotton*, 3 Cal.2d 384 [44 P.2d 350]; *Abbey* v. *Zimmerman*, 12 Cal.App.2d 311 [55 P.2d 903]; *Maguire* v. *Corbett*, 119 Cal.App.2d 244 [259 P.2d 507]; *Heffernan* v. *Bennett & Armour*, 110 Cal.App.2d 564 [243 P.2d 846]; *Menick* v. *Goldy*, 131 Cal.App.2d 542 [280 P.2d 844]). The evidence does not show, and the findings properly

disclaim, any such intent on the part of the plaintiff, or any reliance by him on anyone's suggestion that he execute the deed on the Brooks Avenue property on November 8, 1948, for that purpose. On the contrary, it is apparent that the motivating factor in the plaintiff's transfer, and that upon which he relied, was decedent's representation that the conveyance to her should be made for convenience, to expedite the vesting of the property in the survivor upon the death of either without cost and necessity of probate; and as long as they were married she could not do anything with it "without his name."

At the trial various witnesses testified on both sides creating factual conflicts in the evidence. Its weight and the credibility of the witnesses were for the trier of fact; with its determination in these matters we will not interfere. As they had a right to do, the jury, and ultimately the trial court, accepted the testimony of plaintiff's witnesses as against that of those testifying on behalf of the estate.

The evidence viewed in the light most favorable to the judgment discloses complete reliance by plaintiff upon his wife and trust and confidence in her handling of the community funds during the 19 years of their marriage; and a well designed and executed secret scheme on her part to gain control of their property that she might dispose of it as she saw fit upon her death. The exact moment at which she conceived this scheme and actively put it into operation is, of course, a question of fact, the determination of which depends upon all of the circumstances surrounding the relationship of the parties during their marriage. Her intent in this connection in 1944 and 1948 when plaintiff executed two deeds, since she is now deceased, must be inferred from her acts, declarations and conduct before, at the time of and subsequent to the transfers of the properties by plaintiff. The decedent, a divorced woman, and plaintiff a widower were married in 1937. For two years thereafter, Rena Wolfson, a child of decedent's previous marriage, lived with the parties but was later placed in a private sanitarium. At the outset of the marriage the parties owned nothing; decedent was not employed, but plaintiff, through his efforts in an ice cream distributing business, gradually accumulated a little money. They had a discussion about their finances and decedent suggested to plaintiff that she should handle the money and take complete charge of their financial affairs so she could see to it that they would always be provided for, never again be dependent on charity and that no depression

would recur in their future. She further suggested that henceforth he turn over to her all of his earnings for her to deposit and she would pay all of the bills. Relying upon her "100%" and having trust and confidence in her, he permitted her to take care of all of their finances and investments. Decedent started a bank account with the funds they had accumulated and proceeded to invest some of them through the purchase of Avenue 19 and Brooks Avenue properties, the deeds to which originally vested title in their names as joint tenants, the legal effect of which was not known by plaintiff. Each parcel was income property, and the rent therefrom and other income, including plaintiff's earnings, were used to pay encumbrances thereon. In this manner, both parcels were eventually paid off. From time to time decedent told plaintiff she was saving the money for their future and old age, for independence so they would never have "to go on charity any more like we (they) did during the depression." At all times they were getting on "very nicely" together and plaintiff trusted her "just 100%." When both properties were finally paid off, plaintiff and his wife had another discussion about finances; decedent, handling the funds as before, continued to tell him she was banking the money. He never asked to see the bank book because he trusted her, and testified "if you can't trust your wife, who would you trust."

Without question a confidential relationship over and above that arising out of the normal marital relationship existed between the parties; and it was in this climate in 1944 and 1948 decedent talked to plaintiff about the Avenue 19 and Brooks Avenue properties. Both had been taken in their names as joint tenants; but plaintiff was not aware of the legal effect of joint tenancy when decedent suggested to plaintiff he execute the deeds in question, taking the properties out of joint tenancy and placing one in their names as tenants in common and the other in decedent's name as her separate property. Prior to his execution of the deed to the Avenue 19 property and for the purpose of inducing plaintiff to deed it to them both, as community property, decedent told him "(I)n case one of us dies, and we got to go to a lot of trouble to get the ownership, the other half ownership, and on the community property we wouldn't have to do this, see, (it) immediately becomes, we become, whichever survivor becomes the owner of the whole place" and that Sam Hozman (lawyer and first husband of Ruth Bielsky, coexecutor of her estate)

had told her the same. Plaintiff believed her and relying upon her statements, agreed to and did execute the deed in February, 1944, to the Avenue 19 property to both as tenants in common. He testified he told her ''(I)f you want it that way, its okay with me''; but that he neither intended to give plaintiff, nor understood that he was relinquishing to her, his interest in the property, at all times believing that he still retained the same and would inherit it all upon her death without the expense of probate; and further that he executed the deed to expedite the vesting of the property in him in the event he survived her.

Under much the same circumstances, plaintiff deeded the Brooks Avenue property to decedent as her separate property on November 8, 1948. At that time he was engaged in the furniture business and ''needed some money.'' He told her this, and at various times she gave him funds from the community assets. She was still handling all of the finances and banking the money and paying the bills. Again discussing their affairs, she suggested ''(s)upposing you turn over the property to me for convenience sake . . .'' She told him that Sam (whom she knew plaintiff also trusted) said she should suggest to him that ''she should get the property in her name only''; that as long as they were still married she would be able to do nothing with the property without his name (signature) and he would receive it as survivor at her death; and that Sam told her that according to California law the property would belong to plaintiff if she died first, without expense of probate. Believing her statements plaintiff deeded the property to her, and himself wrote into the deed ''Mary Slater, married woman, as her separate property.'' Plaintiff did not check on any of her statements to him because he trusted her and relied on her. At no time until after his wife's death did plaintiff realize the legal effect of these transactions; and he at no time intended to release to her his interest in either property. That decedent knew her representations were false and she made them to induce plaintiff to execute the deeds as part of her scheme to acquire the property for her own purposes is borne out by her discussions and confidences with others concerning the property and a will, her subsequent secret execution of a will leaving the same to her daughter and, unknown to plaintiff, the purchase of bonds in her name and that of her daughter from community monies. During all of this time and without his knowledge and permission, decedent was secretly purchasing, with community funds which plaintiff had entrusted to her

care, United States savings bonds, approximately $2,000 of which she, unknown to plaintiff, placed in her name alone, and $10,000 in her name and that of Rena Wolfson, in joint tenancy. She at no time discussed this with plaintiff who had no knowledge of the existence of the bonds until her death. However, decedent did discuss the purchase of the bonds with others, left them with a third person for safe-keeping, discussed with others the execution of a will and made her last will and testament in 1951 wherein she left both pieces of property and the bonds in her name to Rena Wolfson. It was not until her funeral plaintiff learned of the true state of his affairs, that decedent had diverted community assets and that at the times the deeds were executed she intended upon her death to leave the property to her daughter.

It is apparent from the evidence that the confidential relationship existing between plaintiff and decedent arose out of more than the mere fact they were married and living together. As to transactions between husband and wife "the rule with respect to confidential relationships obtains and precludes either from obtaining unfair advantage of the other through fraud, mistake or undue influence." (*Dale* v. *Dale*, 87 Cal.App. 359 [262 P. 339].) The unfair advantage of plaintiff taken by decedent in this atmosphere of trust and confidence is obvious from the evidence; as is the undue influence she exerted upon him.

Appellants argue that in connection with the transfer of the Avenue 19 property, decedent's misrepresentations were made after plaintiff executed the deed and thus could not serve as an inducement for the conveyance. Neither the record as a whole, nor that portion of plaintiff's testimony referred to by appellants, alone or read in conjunction with his other testimony, bears this out. The most the latter discloses is that a few days after the deed was executed by plaintiff, decedent told him that she had been advised to have him do so by Sam Hozman. This certainly does not preclude a finding from the other evidence in the record that before he executed the deed she told him that, if he would convey the property to them as tenants in common, it would still remain community property and it would expedite the transfer of the property to the survivor without the expense of probate and taxes.

 With reference to the savings bonds the evidence is apparent that when the parties were married they owned nothing; that they had previously been on charity. After working hard in the ice cream distributing business earning

a small profit each day, plaintiff finally accumulated a little money. He supported the family, provided for the care of Rena Wolfson and paid his bills from his daily earnings and the income in rents their two places of property yielded. The latter were finally paid in full from the rent, their savings and plaintiff's earnings. During this time, decedent was handling all of the money and, without plaintiff's knowledge, from the funds coming into her possession from these sources, she purchased savings bonds totalling approximately $12,000. Although decedent received $4,000 by reason of the death of her former husband the disposition, if any, of the money cannot be traced—there was no evidence concerning how the funds were used and no proof that they purchased savings bonds, paid off the properties, or were spent for living expenses. However, the evidence shows that for two years after the marriage the incompetent daughter of decedent by a prior marriage lived with the parties and thereafter was placed by them in a sanitarium. On the record before us, it is more reasonable to assume that the money was spent for her care than to assume it was spent in any other manner. Moreover, the $4,000 has not been, and cannot, under the evidence, be traced. We can only conclude therefrom that community funds went into the purchase of the properties.

Proof of her deceit and fraud is borne out by testimony that decedent, upon purchasing the bonds did so secretly and without knowledge of plaintiff, placed them, at one time, with the owner of the sanitarium where her daughter was staying and on other occasions with the Bielskys, the coexecutors of her estate, and put none of them in plaintiff's name. She took other persons into her confidence concerning the bonds, the transfer of the two properties and her will, but she at no time discussed these matters with plaintiff. It is plain that the welfare of her daughter was foremost in her mind and that it was her desire to see that she was cared for after her death even at the expense of her husband. It is likewise apparent that plaintiff, believing he was making the conveyances for convenience in handling and disposing of the property upon death, at no time intended to relinquish his rights to any of the property.

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.