[Civ. No. 27465. Fourth Dist., Div. Two. Mar. 17, 1983.]

BANK OF CALIFORNIA, Plaintiff and Appellant, v.
VIRTUE & SCHECK, INC., et al., Defendants and Respondents.

COUNSEL

Lawler, Felix & Hall and Robert Henigson for Plaintiff and Appellant.

Hillel Chodos for Defendants and Respondents.

OPINION

**McDANIEL, J.**—This is an appeal from a judgment entered on a special verdict in an action to set aside a conveyance alleged to have been in fraud of creditors. Judgment was entered for defendants, and plaintiff appealed. We affirm the judgment.

FACTS[1]

R. Edmund McMullan (McMullan), a Canadian accountant by profession, planned to produce a motion picture in California, to be entitled "Yockowald" and to star the well-known singer, Tom Jones. McMullan hoped to finance the production by selling shares in the venture to small investors for use as a tax shelter. However, McMullan unexpectedly incurred large expenses early in the production process, before the anticipated receipt of income from the sale of shares.

One such bill was with the law firm of Virtue & Scheck, Inc. (V & S), whom McMullan had employed to render a tax opinion on the film. Later, he employed the firm for a variety of services connected with the film project, including work for various business entities utilized by McMullan for work on the film; these entities included limited partnerships in which McMullan was the general partner, and a Canadian corporation, P.G. Professional Group Services, Ltd. (P.G.). Consistent with their business practice, V & S opened up a separate billing account in the name of each of the entities for which it did legal work. Bernard Schneider, the shareholder member of the firm who did most of the work for McMullan, testified that, for the sake of simplicity, he eventually had all of the monthly billings sent to the office of P.G.

Unfortunately for McMullan, the sale of shares went poorly. Filming commenced in July of 1976, but stopped after only three or four weeks because of a lack of funds. During this period, McMullan, desperate for funds, obtained loans from several sources, including the Bank of California (plaintiff herein). The loans from plaintiff were unsecured.

Even after the production had shut down, McMullan remained optimistic that he could obtain additional financing and complete the picture. In an October 1976 meeting with Schneider, McMullan and his wife promised that they would pay all of the legal bills eventually.

---

[1]The facts behind this litigation are involved; fully half of appellant's 50-page opening brief is committed to a statement of the case. In the interest of economy of expression, we have included only those facts essential to an understanding and determination of the issues.

Apparently one of the reasons for the shortage of funds was plaintiff's refusal, in August, to make any further loans to, or cover overdrafts by, McMullan. After several months' delay, plaintiff, in February 1977, filed a complaint to recover the roughly $145,000 owing from McMullan, along with an application for a right-to-attach order seeking the issuance of a writ of attachment to levy a lien against a residence in Palm Springs owned by McMullan and his wife. Significantly, plaintiff did not contemporaneously seek a temporary protective order to prevent a transfer of the property.

When McMullan learned of the actions undertaken by plaintiff, he informed Schneider and a meeting was arranged between McMullan, Schneider and Virtue, also a partner in the firm. McMullan believed that he had good defenses against plaintiff's action and asked that V & S defend it. Virtue informed McMullan, because of the large amounts in arrears, owed to V & S, that they could not undertake such defense without a substantial payment on account. It was then agreed that McMullan would transfer the Palm Springs property, together with all its furnishings and furniture, to V & S in exchange for release of an account worth $49,000 owed by P.G. to V & S.[2] A quitclaim deed was prepared, signed by the McMullans and recorded the next day, February 16, 1977.

After the conveyance, McMullan continued to reside in the property paying to V & S its monthly carrying costs on the property. In July, after V & S had completed a refinancing of the property, McMullan, according to a letter from Schneider to McMullan, occupied the premises as a month-to-month tenant, paying an amount of rent roughly equal to the new monthly debt service and other costs. McMullan continued on as a tenant until late 1977 or early 1978.

Meanwhile, in response to the complaint filed by plaintiff, V & S contacted plaintiff's lawyers and arranged a deal whereby McMullan stipulated to a judgment against him, in return for plaintiff's agreement to delay the time for repayment and forego any effort to place a lien on the house until September. V & S did not disclose to plaintiff that the subject of the proposed attachment had already been transferred. Significantly, however, an updated financial statement on McMullan, received by plaintiff in April, no longer included the Palm Springs property on his schedule of assets.

September arrived and McMullan was again unable to make payment. Plaintiff then came to realize that there had been this conveyance to V & S and, in March 1978, it commenced this litigation to set aside the conveyance and recover damages. Plaintiff also recorded a lis pendens against the property. The

[2]After subtracting a number of outstanding liens on the residence, the value of the house was determined by the parties to be equivalent to the P.G. receivable. Although plaintiff complains in a footnote that the house was undervalued, it does not raise the point as an issue on appeal.

lis pendens rendered the property unmarketable. V & S posted a bond to expunge the lis pendens and sold the property to a third party. Plaintiff's suit is thus directed against the bond rather than the property.

Plaintiff's complaint alleged that the transfer of the Palm Springs residence and furnishings was fraudulent. After a two-week trial, the case was submitted to a jury. The jury returned special verdicts against the plaintiff. Plaintiff appealed, alleging three errors in the trial court's instructions.

DISCUSSION

I

THE CONCLUSIVE PRESUMPTION OF CIVIL CODE SECTION 3440

■ With reference to the household furnishings of the McMullan residence, plaintiff contends that the trial court erred in refusing to instruct on the conclusive presumption of fraud recited in Civil Code section 3440. The contention is meritless.

Civil Code section 3440 in pertinent part provides: "Every transfer of personal property and every lien on personal property made by a person having at the time the possession or control of the property, and not accompanied by an immediate delivery followed by an actual and continued change of possession of the things transferred, is conclusively presumed fraudulent and void as against the transferor's creditors while the transferor remains in possession. . . ."

Section 3440 of the Civil Code is expressly inapplicable to "property exempt from enforcement of a money judgment." (Civ. Code, § 3441, subd. (f).) Under the provisions of Code of Civil Procedure section 690.1, "necessary household furnishings and appliances ordinarily and reasonably necessary to, and personally used by, the debtor and his resident family . . ." are exempt from execution.

The trial court declined plaintiff's request for an instruction per Civil Code section 3440 for the reason that the household furnishings contained in the Palm Springs residence and conveyed by McMullan to V & S were exempt from execution under section 690.1 and therefore, that section 3440 of the Civil Code was inapplicable. Thus, the particular question under this assignment of error is whether the trial court correctly determined that the personal property in question was exempt from execution under the terms of Code of Civil Procedure section 690.1.

Plaintiff contends that the meaning of section 690.1 is plain. It argues that the statutory phrase "debtor *and* his resident family" is written expressly in the conjunctive and we must presume that the Legislature, which could have employed the disjunctive, did so for a purpose. (See *Whitley* v. *Superior Court* (1941) 18 Cal.2d 75, 78 [113 P.2d 449].) Plaintiff contends that the word "and" in the statute means that the debtor must reside with a family and that the word "resident" imposes a United States residency requirement.

Thus, plaintiff's reading of the statute would exclude any debtor who (a) has no family, (b) resides apart from his family, or (c) does not permanently reside in the United States together with his family. Because there was no substantial evidence in the record that McMullan, a Canadian citizen, ever permanently resided with his family in Palm Springs, plaintiff contends that the exemption was clearly inapplicable to McMullan.

As with most questions of statutory construction, whether the Legislature actually and consciously intended to exclude these three categories of debtors is not a question which can be precisely confirmed or refuted. Nevertheless, the legislative history, the writers, and the cases contain persuasive indication that the Legislature did *not* intend to exclude these classes of debtors.

The Legislature enacted Code of Civil Procedure section 690.1 in 1970 (Stats. 1970, ch. 1523, § 10) to replace the old household furnishings exemption formerly contained in Code of Civil Procedure section 690.2. Former section 690.2 applied to household furnishings "belonging to the judgment debtor." As noted, the new version exempts those furnishings personally used by the "debtor and his resident family." Was the change intended to be one of substance or merely style?

The authorities are in agreement that the purpose of the 1970 amendment was to modernize and liberalize the household furnishings exemption. As one contemporary legal observer noted, "The major thrust of the new legislation is directed toward liberalizing and modernizing the debtor's exemptions." (46 State Bar J. 639, 643 (1971).) The new statute, wrote another commentator, "greatly updates and modernizes . . . section 690.2. The new code section removes outdated and nonfunctional provisions, such as the specific exemption of stoves and stovepipes, cows and their sibling calves, and hogs and their suckling pigs." (Comment, *California's New Household Goods Exemption and the Problem of Personal Accountability* (1972) 12 Santa Clara L.Rev. 155, 156.)

There is no suggestion that an ancillary purpose of the Legislature, in enacting the amendment, was to narrow the scope of protection afforded debtors by requiring that they reside with their families in the United States. When, in

1967, a committee of the State Bar of California recommended that section 690.2 be amended to the form in which it read at the time of trial, their purpose, they wrote, was to "eliminate . . . as far as possible specific enumeration and itemization or [*sic*] personal property which is considered to be a household item or personal effect . . . . It is believed that the broad description of exempt property in the proposed amendment will avoid . . . problems. . . ." As to the scope of the new law, they stated: "Because past statutes and case law will be a guide as to what items are to be exempt, the coverage of the present statutes should not be changed by the proposed amendment." (*Committee Report—Relations of Debtor and Creditor* (1967) 42 State Bar J. 869, 874.) It is of particular relevance here that the State Bar's committee report referred interchangeably to the "debtor and his family" and "the debtor or his family." (*Id.,* at p. 874.)

It is quite clear that no one then interpreted the amended statute as narrowing the scope of the exemption to debtors who were residents of the United States living with their families.

Indeed, one law review author chose to examine the impact of the new law using an actual case which had concerned a single debtor living alone; this refinement was never mentioned in the article and was clearly considered to be of absolutely no significance. (See Comment, *California's New Household Goods Exception and the Problem of Personal Accountability* (1972) 12 Santa Clara L.Rev. 155; *Independence Bank* v. *Heller* (1969) 275 Cal.App.2d 84 [79 Cal.Rptr. 868].)

The phrase "and his resident family" clearly *extends* the exemption to household furnishings used by members of the debtor's family residing with him. It would be illogical and contrary to the spirit of the law to hold that it simultaneously *contracts* the scope of the exemption by excluding debtors who live alone. Furthermore, the contention that the word "resident" was intended to exclude noncitizens and nonresident aliens strains credibility to the breaking point. "Resident" merely modifies "family."

Thus, we conclude that the change in language in the amended statute was one of style only, and was not intended to effectuate the contraction of coverage suggested by plaintiff.

In reaching this conclusion we are mindful of the long-standing policy of the California courts in favor of liberally construing the exemption statutes in favor of the debtor. (See *Independence Bank* v. *Heller, supra,* 275 Cal.App.2d 84, 88-89; *Holmes* v. *Marshall* (1905) 145 Cal. 777, 778-779 [79 P. 534]; 5 Witkin, Cal. Procedure, Enforcement of Judgment, § 25, p. 3406.) This same policy applies to *amendments* to exemption statutes. As the court in *Los Angeles*

*Finance Co.* v. *Flores* (1952) 110 Cal.App.2d Supp. 850 [243 P.2d 139] stated: "It follows logically that this same policy requires a *strict* construction of any provisions which tend to limit the exemptions . . . . 'Conversely to the rule of liberal construction of the grant of an exemption, provisions which limit or take away the exemption are strictly construed, whether in provisos and exceptions or in amending statutes.'" (*Id.*, at p. 854.)

We note, finally, that the Legislature recently repealed Code of Civil Procedure section 690.1 in the 1982 legislative session. Its replacement, effective July 1, 1983, provides, in addition to the exemption for the debtor and his family, for a second exemption for the spouse and family living separate and apart from the debtor. (Stats. 1982, ch. 1364, § 704.020, subd. (a)(2).) Hence, the interpretation we apply to the old law is consistent with the legislative purpose explicit in the new legislation. At the same time, we note that the new statute effects a major change in the household furnishings exemption by providing for the first time that the property be used in the debtor's "principal place of residence." (Stats. 1982, ch. 1364, § 704.020, subds. (a)(1),(2).) Were the new statute applicable here, McMullan clearly could not take advantage of the exemption. However, it it axiomatic that the Legislature "may not revise the operation of an existing law in the form of an amendatory statute to affect past transactions." (*Cal. Emp. Stab. Com.* v. *Chichester etc. Co.* (1946) 75 Cal.App.2d 899, 901 [172 P.2d 100], citing *In re Coburn* (1913) 165 Cal. 202, 210 [131 P. 352]; see also *People* v. *Cuevas* (1980) 111 Cal.App.3d 189, 199 [168 Cal.Rptr. 519].) Therefore, the change carries no force in the case before us.

The two out-of-state cases cited by plaintiff are unpersuasive. In both *In re Trammell* (D.C.Ga. 1925) 5 F.2d 326 and *Schwartz* v. *Birnbaum* (1895) 21 Colo. 21 [39 P. 416], the courts denied the benefit of a homestead exemption to debtors whose families resided out-of-state. In each case the applicable state statute referred to the debtor as the "head of a family," thus clearly conditioning the exemption on the existence of a resident family. The statute here makes no reference to "head of a family."

In sum, we hold that the trial court properly concluded that the household furnishings were exempt from execution under then effective Code of Civil Procedure section 690.1 and correctly refused to instruct on the conclusive presumption recited in Civil Code section 3440.

## II

### FRAUD PER SE OR FRAUD AT LAW

Plaintiff next contends that the trial court erred in refusing to instruct as plaintiff had requested on the issue of good faith and fair consideration. We disagree.

■ It is settled law, in the absence of fraud, and even though insolvent, that a debtor may prefer one creditor over another. (*Bradley* v. *Butchart* (1933) 217 Cal. 731 [20 P.2d 693]; *Pope* v. *National Aero Finance Co.* (1965) 236 Cal.App.2d 722 [46 Cal.Rptr. 233]; *Commons* v. *Schine* (1973) 35 Cal.App.3d 141 [110 Cal.Rptr. 606]; Civ. Code, § 3432.) However, California provided by statute that a conveyance may be constructively fraudulent as to creditors, irrespective of actual intent, "if the conveyance is made . . . without a fair consideration." (Civ. Code, § 3439.04.) The Civil Code provides that "fair consideration" is given for property "(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or [¶] (b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained." (Civ. Code, § 3439.03.) Thus, "good faith" is an integral aspect of "fair consideration."

The evidence in the record is undisputed that in February 1977 McMullan conveyed the Palm Springs residence to V & S. After the conveyance, McMullan continued to reside in the subject property. A letter dated July 13, 1977, from V & S to McMullan indicates that McMullan occupied the property as a month-to-month tenant, paying an amount of rent roughly equal to the carrying costs of the house; it is unclear whether this arrangement obtained before July 1977 as well.

■ Plaintiff contends that McMullan's continued residence in the property after the conveyance to V & S raised a conclusive presumption of bad faith and requested the following instruction: " 'Good faith' as used in these instructions means (1) an honest belief in the propriety of the transaction; (2) no intent to take unconscionable advantage of others; and (3) no intent to, or knowledge of the fact that the activities in question will hinder, delay or defraud others. If you find that there was a secret agreement between the transferor and transferee to reserve a secret interest in the property conveyed and that the secret interest reserved was a substantial interest even though not of great value, then you shall find there was a want of 'good faith' and, accordingly, that no 'fair consideration' was given." The trial court instructed on the definitions of "good faith" numbered (1) and (2) above, but refused to give the remainder of the instruction. It was this refusal which plaintiff now contends was prejudicial error.

Plaintiff's instruction on conclusive presumption of fraud was derived from language contained in *Lukins* v. *Aird* (1867) 73 U.S. (6 Wall.) 78 [18 L.Ed. 750], one of five out-of-state cases which plaintiff cites for the rule of law that evidence of a secret trust or reservation of interest in the grantor raises a conclusive presumption of fraud. Plaintiff appears to assume that the rule, if accepted in five states, must be accepted everywhere. Contrary to plaintiff's

assumption, however, this rule has never enjoyed universal approbation. Indeed, whether a secret reservation or trust amounts to fraud per se, or only *evidence* of fraud, is a question over which American courts have long pondered and disagreed. (See 37 Am.Jur.2d, Fraudulent Conveyances, §§ 10, 12, 29, 30; 37 C.J.S., Fraudulent Conveyances, §§ 92, 95, 327, pp. 928-929, 1054-1055.)

All agree that the requirement of good faith and fair consideration in conveyances affecting creditors may be traced to the old English statute of 13 Elizabeth, chapter 5.[3] Beyond that, all agreement ends. Even so famous and seminal a decision as *Twynes* case (1601) 3 Coke, 80b, 76 Eng. Reprint 809, 5 Eng. Rel. Cas. 2, which has been called the "fountainhead" of the law of fraudulent conveyances (Clark, *The Duties of the Corporate Debtor to Its Creditors* (1977) 90 Harv.L.Rev. 505, 513-514), has apparently been a source of conflicting interpretations. For, although cited by plaintiff, the case has generally been interpreted as standing for the proposition that a secret reservation is not conclusive, but merely evidence of fraud: " 'A secret trust inconsistent with the terms of a sale of property is evidence of fraud, if not satisfactorily accounted for; but it is not fraud per se, nor conclusive evidence of fraud . . . . That this was not considered to be the law in ancient times appears very clearly by *Twynes* case [citation]. It was in that case held that a secret trust, and the possession of goods sold by the vendor after the sale, were only badges of fraud, and were not fraudulent per se.' " (*Oriental Bank* v. *Haskins* (1841) 44 Mass. (3 Met.) 332 quoted in 68 A.L.R. 320.)

*Lukins* v. *Aird, supra,* 73 U.S. (6 Wall.) 78 [18 L.Ed. 750] is the earliest and perhaps most influential of the cases cited by plaintiff which endorses the rule of fraud per se. Yet cases equally as venerable have opposed this view. Thus, in the early case of *Livesay* v. *Beard* (1883) 22 W.Va. 585, the fact that an insolvent debtor conveyed his land with the secret reservation that he would have the use of the land for a period of time without payment, was held to be merely evidence that the conveyance was fraudulent. (68 A.L.R. 313.) The broad holding in *Lukins* v. *Aird, supra,* was criticized in *Howe Mach. Co.* v. *Claybourn* (C.C.Mich. 1881) 6 Fed. 438, where the court stated: "It cannot be held in this case, as in *Lukins* v. *Aird* [citation] . . . that for a debtor to sell his land, convey it by deed without reservations, and yet secretly reserve to himself a benefit, is fraudulent as a conclusion of law . . . . It is the broad language of the court, applied to any such conveyance . . . without qualification, which I do not accept or apply in this case." (*Id.,* at p. 440-441.)

The question whether the reservation of a secret trust or interest in the grantor is conclusive or merely evidence of fraud arises in a variety of situa-

---

[3] "This Act . . . shall not extend [to any property which] is or shall be upon good consideration and *bona fide* lawfully conveyed."

tions which form a common pattern across the states. A debtor may convey real property to a creditor, with a secret agreement whereby the creditor will return to the debtor any surplus of the proceeds from the sale of the land after deducting the amount of his debt. Although the jurisdictions are split, many hold that proof of such an agreement is merely evidence, or what is commonly called a "badge" of fraud, rather than conclusive proof of fraud. Confronted by such an agreement in the venerable case of *Muchmore* v. *Budd* (1891) 53 N.J.L. 369 [22 A. 518], the court stated: "The effect of such an agreement upon the attempt to transmit an interest in property has been the subject matter of considerable contrariety of opinion. It is generally regarded as a badge of fraud. But, upon the point whether it carries with its presence an unexplainable inference of fraud, the courts have divided. My conclusion is that each case must stand upon its own footing, and that no doctrine of fraud per se . . . ought to be laid down." "A secret trust inconsistent with the terms of the sale of property is evidence of fraud, but it is not conclusive evidence of fraud." (*Id.,* at p. 522-523.) Other courts have reached the same conclusion. (See *Merillat* v. *Hensey* (1908) 32 App.D.C. 64, affd. in (1911) 221 U.S. 333 [55 L.Ed. 758, 31 S.Ct. 575]: "The fact that the reservation of any surplus after paying the debt secured was not disclosed in the assignment itself was a circumstance of suspicious character, but not as a matter of law inconsistent with an honest intent.") (*Id.,* at p. 346 [55 L.Ed at p. 762].) (*Fuller* v. *Griffith* (1894) 91 Iowa 632 [60 N.W. 247, 248]: "We are not inclined to adopt the more stringent rule, but are content with the doctrine that such conveyances are a badge of fraud . . . .")

The question whether a secret reservation of an interest in the grantor constitutes fraud per se or merely evidence of fraud often arises where there is an absolute conveyance with a secret agreement that the property will serve as security for a debt, and that the grantee will reconvey upon payment of the debt. Here again the authorities are split, many agreeing with the holding of the court in *Bank of Plymouth* v. *Ritchey* (1927) 115 Neb. 493 [213 N.W. 587]: "A conveyance of land by a debtor to secure a debt, though absolute on its face and accompanied by a secret understanding that the deed is to operate as a mortgage, is not fraudulent as to other creditors as a matter of law, but is only a circumstance to be taken into consideration with all other circumstances of the transaction. . . ." (*Id.,* at p. 590; see also *Rock* v. *Collins* (1898) 99 Wis. 630 [75 N.W. 426, 428-429]; *Hanneman* v. *Olson* (1928) 209 Iowa 372 [222 N.W. 566, 567].)

The California decisions dealing with secret reservations or trusts have, either expressly or implicitly, evinced a clear policy in favor of treating such agreements as evidence of fraud. "[T]here are certain circumstances which so frequently attend conveyances or transfers to defraud creditors that they are recognized as badges or indicia of fraud. [Fn. omitted.] Though the court must

infer or find the existence of a fraudulent intent from the evidence, and may not declare the transaction void as a matter of law because of the appearance of badges of fraud, [fn. omitted] badges or indicia of fraud that might be insufficient when considered separately may, by their number and association when considered together, suffice as strong evidence of fraudulent intent." (16 Cal.Jur.3d (rev.) pt. 2, Creditors' Rights, § 332, p. 448.)

In the early case of *Sukeforth* v. *Lord* (1891) 87 Cal. 399 [25 P. 497], a creditor sought to set aside a conveyance by his debtor to another creditor; the latter had secretly agreed to sell the property and return the excess over the amount of his debt to the grantor/debtor. The Supreme Court held that the trial court had properly instructed the jury as follows: " 'If a debtor who is insolvent transfers to one of his creditors all his property except such as is exempt from execution, with an understanding or agreement between himself and his creditor that the latter will dispose of the property so transferred, and after paying himself, refund whatever remains to the debtor, such an understanding or agreement would be *a circumstance tending to show that the transfer was made with the intent to delay and defraud creditors*; and where the value of the property so transferred is grossly in excess of the creditor's claim, that is a circumstance tending to show that such an understanding exists.' " (*Id.*, at p. 409, italics added.)

A similar case was *Judson* v. *Lyford* (1890) 84 Cal. 505 [ 24 P. 286], where the debtor deeded real property to a certain creditor who agreed to sell the property, pay off the mortgages and pay the surplus over his debt to the debtor. The court held that the question whether the conveyance was fraudulent as to other creditors was one of fact for the jury: "If the charge be true—that is to say, if the deed was *in fact* made to hinder and delay plaintiff's rights as a creditor then the deed was void . . . . This . . . is a question of fact for the jury." (*Id.*, at p. 507.)

The reservation often takes the form of a secret trust, whereby the grantor conveys the property in deed absolute but retains the rights to profits and income, or the right to manage or to repurchase the property. In *Purkitt* v. *Polack* (1861) 17 Cal. 327, a creditor sued to set aside as fraudulent a deed of real property by his debtor to another alleged creditor where a secret deal allowed the debtor to retain all of the rents and profits from the property. The court held that the secret trust was potent *evidence* of fraud: "The conclusion of fraudulent intent is usually gathered from the circumstances; and it is not often that the proof is more satisfactory than here. The control of the property after the alleged sale . . . [was] amply sufficient to raise a prima facie intendment of fraud in the transaction." (*Id.*, at p. 332; accord, *Southwick* v. *Moore* (1923) 61 Cal.App. 585 [215 P. 704]; *Bush & Mallett Co.* v. *Helbing* (1901) 134 Cal. 676 [66 P. 967]; see also *Kemp* v. *Lynch* (1937) 8 Cal.2d 457 [65 P.2d 1316]; *Sheean* v. *Michel* (1936) 6 Cal.2d 324 [57 P.2d 127].)

Plaintiff, however, contends that the foregoing cases cited in opposition to the rule of a conclusive presumption of fraud are distinguishable from the case herein. Specifically, plaintiff contends that these cases were either concerned with actual as opposed to constructive fraud; or, that in these cases the transferee was unaware that the transaction would render the transferor insolvent. In our view, these are distinctions without a difference.

In determining whether the transaction is actually *or* constructively fraudulent, the transferee's knowledge of the debtor's insolvency is merely another "badge" of fraud, irrespective of whether this particular badge occurs in conjunction with a secret reservation of an interest. Both the cases and this court support this interpretation as the better rule of law.

In sum, California courts have consistently treated a secret reservation in the grantor as potent evidence of fraud, but not as conclusive of fraud in law. That determination is one for the jury, to be made " 'by inference from the circumstances surrounding the transaction, the relationship and interests of the parties.' " (*Kemp* v. *Lynch, supra*, 8 Cal.2d 457, 462 quoting *Fross* v. *Wotton* (1935) 3 Cal.2d 384, 393.) The trial court in this case so instructed. Therefore, we conclude that the trial court's refusal to instruct on conclusive presumption of fraud was proper.

Perhaps a shorter answer to the contention is that there was no evidence of a secret reservation of interest to support the requested instruction. By the time the case went to trial V & S had sold the house to a third party, all of which would seem to negate entirely any possibility of a secret trust.

### III

### THE REFUSAL TO INSTRUCT ON THE REQUIREMENT OF A WRITING

Plaintiff's final contention is that the trial court committed prejudicial error in refusing to instruct that the undertaking of one to answer for the debt of another must be in writing. The contention is meritless.

In consideration for the conveyance of the house V & S transferred their account receivable from P.G. to the McMullans. The jury concluded that the McMullans were personally liable to pay the indebtedness of P.G. The evidence of the McMullans' personal liability was Schneider's testimony that the McMullans had orally guaranteed to pay the legal bills of the various entities, including P.G., through which McMullan had channeled his efforts to produce the film.

Plaintiff requested that the jury be instructed as follows: ". . . in all events, the antecedent debt discharged must be the legally enforceable obligation of the

transferor and not that of a third party. For the debt of one person to be the legally enforceable obligation of another, the other must have signed a writing undertaking to guarantee payment of the debt."

The instruction actually given omitted "legally" and the entire last sentence. These omissions, plaintiff contends, allowed the jury to conclude that the McMullans' oral promise bound them as a matter of law to guarantee the P.G. debt, when, in fact, it was not a legally enforceable guarantee because it was not evidenced by a writing.

V & S, in reply, argue that plaintiff, as a third party, may not assert the McMullans' potential defense of the statute of frauds; that the McMullans, in any event, waived that defense; that a writing was not required because the guarantee was given primarily for the McMullans' own pecuniary advantage; and, that a declaration by McMullan attached to defendants' motion for summary judgment, attesting to the fact that he had orally promised to guarantee the indebtedness of P.G., constituted an adequate writing.

Plaintiff responds that the record is devoid of any evidence showing that the guarantee redounded primarily to the McMullans' pecuniary advantage; that the McMullans' declarations could not satisfy the writing requirement because they were not a part of the trial record, and were created after the trial had commenced; and, finally and most interestingly, that the spirit of the statute of frauds would be violated to permit a debtor (the McMullans), allegedly in collusion with one creditor (V & S), to waive a potential defense (the statute of frauds) so as to effectuate a fraud on another creditor (plaintiff).

Had the case here been of an entirely different nature, and were we now engaged in determining whether, in a suit between V & S and the McMullans, the oral promise by the latter was an enforceable guarantee, the case would be a close one. Indeed, plaintiff asserts that the precise issue is one of first impression in California, and is far from settled elsewhere. Therefore, we fail to see how the trial court's refusal to instruct that a writing was required to make the promise legally enforceable could be viewed as error, much less prejudicial error.

Furthermore, the question of a writing was tangential to the real issue before the jury. The nub of the matter was whether the jury believed that fair consideration was exchanged at the time the property was conveyed. Although McMullans' promise to pay the P.G. debt underlay the consideration exchanged (the transfer of the P.G. receivable to McMullan), the essential issue before the jury was whether the entire transaction was enacted in good faith. If the parties in good faith believed that the promise was binding, then the consideration was good. (See, in the analogous area of forbearance to assert a

doubtful claim, the cases cited in 1 Witkin, Summary of Cal. Law (8th ed. 1973), § 157, pp. 150-151.) The jury decided in favor of the defendants on the issue of good faith. The mere possibility that the promise may not have been legally enforceable was irrelevant to the essential issue of good faith.

Otherwise, there is a serious quesion of whether the statute of frauds is even an issue after an agreement has been fully executed on both sides.

Therefore, we conclude that the trial court's refusal to instruct on the requirement of a writing was proper.

DISPOSITION

The judgment is affirmed.

Kaufman, Acting P. J., and Rickles, J., concurred.

A petition for a rehearing was denied April 4, 1983.