[Crim. No. 24991. Feb. 1, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL DENNIS MAY, Defendant and Appellant.

**COUNSEL**

Linn Davis, under appointment by the Supreme Court, for Defendant and Appellant.

Frank O. Bell, Jr., State Public Defender, and George L. Schraer, Deputy State Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Mark Alan Hart, Gary R. Hahn and Sharlene A. Honnaka, Deputy Attorneys General, for Plaintiff and Respondent.

John J. Meehan, District Attorney (Alameda), Thomas J. Orloff and William M. Baldwin, Assistant District Attorneys, and Christopher N. Heard as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**LUCAS, C. J.**—In this case we consider whether Proposition 8, and its "Truth-in-Evidence" component (Cal. Const., art. I, § 28, subd. (d) (hereafter section 28(d)), abrogated the rule of *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272] (inadmisssibility for impeachment purposes of defendant's extrajudicial statements elicited in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]). As will appear, we have concluded that the *Disbrow* ruling indeed has been so abrogated. Accordingly, we do not reach the People's alternative argument that *Disbrow* should be overruled.

In February 1983, Janice F. lived in a condominium on Milpas Street in Santa Barbara. Seeking a roommate, she placed an advertisement in a local newspaper. On Saturday February 26, she spoke by telephone with a man about the rental, then briefly interviewed him at the condominium. He gave "Dennis" as his first name and a one-syllable last name.

Later that day Laura Jestings drove to the Chili Factory in Santa Barbara to meet friends. After she parked, a man walked briefly with her and mentioned that he was from Canoga Park, was in Santa Barbara for the weekend, and had previously been to the Chili Factory. As she was returning to her car from the Chili Factory, she again saw the man. She entered her car and locked the door. He approached and tapped on the window, and she rolled it down. After a brief discussion he pointed a gun at her and ordered her to open the door and move over. He got into the driver's seat and placed the gun at her waist. He directed her to put her hands behind her back so that he could handcuff her. She resisted, jumped out of the car, and ran away. The man fled, taking neither the car nor anything therein.

On the afternoon of the following day—Sunday, February 27—the man who had spoken with Janice F. about sharing her condominium called and asked if he could come and talk with her further about the matter; she agreed. After the man arrived, they had a brief discussion about the condominium. Suddenly he grabbed her from behind, put his left hand over her mouth, placed a gun at her side, told her not to scream or to make him nervous, forced her up the stairs into a bedroom and handcuffed her behind her back. He asked if she had anything valuable, and she said no. He placed a bandana in her mouth as a gag and removed two rings she was wearing. Next, he put her on the bed on her back, removed her pants and underpants, pushed up her sweatshirt and brassiere to expose her breasts, bit her around the nipple of her right breast, penetrated her with his finger, and raped her. He then tied her hands and took off the handcuffs, replaced her pants and properly arranged the clothing on her upper body, and finally left. At the time of the attack, he was wearing shoes that appeared to be brown with black tones.

In the course of their investigation into the two sets of crimes, the police arrested defendant. Immediately after he was advised of his *Miranda* rights, he stated: "Before I answer a thing I want an attorney present here . . . ." Without providing him with an attorney, however, the police interrogated him and elicited, in addition to denials of involvement in the crimes, various statements indicating he was the perpetrator. For example, he stated that he had visited the Chili Factory, was in Santa Barbara on February 26 and 27, 1983, owned handcuffs, and had owned handguns.

Defendant was charged with the following crimes against Janice F.: burglary, sexual penetration with a foreign object, rape, robbery in an inhabited dwelling, assault with a deadly weapon, and false imprisonment. He was also charged with the following crimes, among others, against Jestings: assault with a deadly weapon and assault with intent to commit rape. He pleaded not guilty.

Before trial, defendant moved under *Disbrow, supra,* 16 Cal.3d 101, to bar any use of his statements to the police on the ground they were obtained in violation of his *Miranda, supra,* 384 U.S. 436, rights. Insofar as the motion sought to bar the prosecution from using the statements in its case in chief, it was impliedly granted. Otherwise, however, it was denied in the following ruling: "It appears to the Court that under Proposition 8, the Federal law must be applied, and the Federal standard must be applied as to the use of statements in violation of the *Miranda* rule. [¶] In this case, . . . there was a specific affirmative statement by the defendant that he wished to take advantage of his rights; that is, have an attorney, and that is repeated later on in the conversation as well. No question that it did not comply with *Miranda.* . . . [¶] The Court does find that the statements were not coerced; that there is no indication of coercion in the statements by length of the interview, or by methods used, or promises made; that there was no indication that if he talked, there would be a deal, that he would get off better if he did. [¶] So the ruling of the court is that under *Harris,* using the federal test, they would be usable as impeachment testimony by the prosecution, if otherwise appropriately usable as impeachment testimony."

After the ruling, defense counsel stated that defendant "will not be testifying, then, under compulsion of the ruling. We don't want to be subjected to the possibility of cross-examination on that particular statement."

At trial each of the victims described the attack she had suffered; Janice F. positively identified defendant as her assailant, and Jestings stated he looked very similar to the man who assaulted her. Another woman, Kathleen C., testified that in January 1983 she advertised in a local paper called Easy Ad for a roommate to share her apartment in San Luis Obispo; a man responded and subsequently attacked her; the incident was similar to that involving Janice F., and the assailant was defendant.

Larry Slayton also testified on behalf of the prosecution. He recalled that defendant, who was carrying a gun, picked him up at his home on a Sunday in February 1983, and drove to Santa Barbara. Defendant told Slayton he was going to see a woman there about an apartment and intended to rape her. Arriving in Santa Barbara, he drove to a block on Milpas Street—which proved to be near Janice F.'s condominium—and parked. He took

out a pair of handcuffs and put them in his pocket. As he exited the car, he told Slayton that if anything happened he should leave. Slayton waited about five minutes and then left. In the early morning of the following day, defendant telephoned him and asked to be picked up; Slayton said he would, but did not. Later that day defendant saw him, became very angry and tried to choke him. He then displayed some rings and said, "This is all I got out of this, and if you would have been there, we could have got stereo components, stereo and a TV." Defendant told him they were going back to Santa Barbara to retrieve his gun, which he had "stashed" there. Slayton, fearing defendant, ran away. Defendant chased Slayton, threatening to kill him, but Slayton eluded him.

Two experts testified for the prosecution. A document examiner was of the opinion that defendant had signed a registration form, giving "Dennis Burke" as his name and "Canoga Park" as his place of residence, in order to obtain a room at the Hope Ranch Motel—which was located about 400 yards from the Chili Factory—for Saturday, February 26, 1983. A serologist was of the opinion that seminal fluid stains found on the clothing worn by Janice F. and Kathleen C. at the time of the attacks could have been produced by defendant.

The prosecution also presented physical evidence linking defendant to the crimes, including two items found at his home: a pair of brown shoes with black spots, and a pair of handcuffs.

In its case in chief and through cross-examination of the prosecution's witnesses, the defense tried to show that Slayton was lying in order to implicate defendant and protect someone else. Defendant, however, did not take the stand.[1]

Defendant was convicted of the crimes charged. On appeal he contended, inter alia, that the court erred in denying his *Disbrow* motion, insofar as it sought to bar the prosecution from using his extrajudicial statements for impeachment. The Court of Appeal expressed doubt that the issue had been properly raised and preserved for appeal because defendant did not testify. The court nevertheless rejected the point on the merits: Concluding that section 28(d) abrogated the *Disbrow* rule and thereby left *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643] to govern the case, it held that the trial court did not err in ruling the statements admissible for

---

[1] In light of the evidence presented by the prosecution, several of defendant's extrajudicial statements appeared more inculpatory than they had prior to trial. Such statements include: defendant had gone to Santa Barbara with Slayton, and had used Easy Ad to sell various items and, notably, to advertise for roommates.

impeachment. Determining defendant's other contentions to be similarly without merit, it affirmed the judgment.

Defendant now contends that *Disbrow* rendered his statements inadmissible for all purposes, including impeachment. The People, however, argue that *Disbrow* has been abrogated by the following provision of Proposition 8, now contained in section 28(d): "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. *Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay,* or Evidence Code, Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press." (Italics added.)

Crucial to the question whether the *Disbrow* rule survives the adoption of section 28(d) is the effect of the emphasized savings clause, and especially the meaning of its phrase, "statutory rule[s] of evidence relating to privilege or hearsay." After careful consideration of the question, we have concluded that the People's position is correct. Accordingly, we hereby adopt the following portion of Justice Abbe's opinion for the Court of Appeal in this case,* which opinion correctly treats the issue: ¶ The trial court held the enactment of [section 28 (d)] repealed the California exclusionary rule first set forth in [] [*Disbrow*].

The *Disbrow* exclusion was based on independent state grounds under article I, section 15 of the California Constitution. It is contrary to the federal rule under the United States Constitution as enunciated by the Supreme Court in *Harris* v. *New York* [, *supra,*] 401 U.S. 222 . . . (*Harris*). The *Harris* court held that statements made to police under circumstances rendering them inadmissible under *Miranda* on the prosecution's case in chief could be admitted for purposes of impeachment of a testifying defendant whose trial testimony was inconsistent with the earlier statements.

The issue here is whether the *Disbrow* exclusionary rule survived the 1982 amendment of the California Constitution by Proposition 8 which added [section 28(d)]. We find it did not.

[] [Defendant] argues that Evidence Code section 940 is an "existing statutory rule relating to privilege" which, [under section 28 (d)] precludes the use of such extrajudicial statements.

---

*Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than the editor's parallel citations) are, unless otherwise indicated, used to denote insertions or additions. (*Estate of McDill* (1975) 14 Cal.3d 831, 834 [122 Cal.Rptr. 754, 537 P.2d 874].)

Evidence Code section 940 provides as follows: "To the extent that such privilege exists under the Constitution of the United States or the State of California, a person has a privilege to refuse to disclose any matter that may tend to incriminate him." Section 940, on its face, is a statutory recognition of the constitutional privileges against self-incrimination. Even assuming arguendo section 940 is an "existing statutory rule of evidence relating to privilege" it is not helpful here. The question is not whether the [defendant] had a constitutional right [under *Miranda*] to refuse to disclose any information during the police interrogation [ ]. He clearly had such rights under both the state and federal Constitutions. The question is rather, given that [defendant's] constitutional privileges against self-incrimination and right to counsel were violated by the interrogation, what remedy is available to him?

In *In re Lance W.* (1985) 37 Cal.3d 873, 886-887 [210 Cal.Rptr. 631, 694 P.2d 744], [we] held: "What [the pertinent portion of] Proposition 8 does is to eliminate a judicially created *remedy* for violations of the search and seizure provisions of the federal or state Constitutions, through the exclusion of evidence so obtained, except to the extent the exclusion remains federally compelled." [We] went on to state at pages 888-889 ". . . that in the absence of express statutory authority therefor courts may not exclude evidence seized in violation of either the state or federal Constitution unless exclusion is compelled by the federal Constitution. . . . [¶] Implicit in the limitation on the courts' power to exclude relevant evidence to the enumerated statutory exceptions is a limitation on the power of the court to create nonstatutory exclusionary rules, whether denominated rules of procedure, rules of evidence, or substantive rules, for the exclusion of unlawfully seized evidence if those rules afford greater protection to a criminal defendant than does the Fourth Amendment. [Fn. omitted.]"

While *In re Lance W.* [, *supra,* 37 Cal.3d 873,] involved exclusionary [ ] [remedies] for violation of [constitutional] search and seizure provisions [ ] rather than the [ ] constitutional rights to counsel and rights against self-incrimination involved here, its reasoning and result are equally applicable. Both [kinds of] exclusionary rules are addressed to evidence obtained by police conduct in violation of constitutional provisions. Both are based on the same rationale[ ] of deterring unlawful police conduct.

For example, *Harris* v. *New York, supra,* 401 U.S. 222, 223-224 [ ], relie[d] on *Walder* v. *United States* (1954) 347 U.S. 62 [98 L.Ed. 503, 74 S.Ct. 354], a case involving the Fourth Amendment exclusionary rules, to permit impeachment with evidence seized in violation of the Fifth Amendment. Similarly in *People* v. *Disbrow, supra,* 16 Cal.3d 101, 107 et seq., [we relied] extensively on cases involving exclusion of evidence obtained in unlawful searches and seizures including *People* v. *Brisendine* (1975) 13 Cal.3d 528

[119 Cal.Rptr. 315, 531 P.2d 1099]. [] *Brisendine,* which excluded illegally obtained evidence on independent state grounds, was held to be abrogated by Proposition 8 in *In re Lance W.*[, *supra,* 37 Cal.3d 873]. Since the issue here arises under the same constitutional amendment, [our] interpretation of that amendment [] is equally applicable in this case. In both instances the relevant provision of Proposition 8 requires the abrogation of the judicially declared exclusionary remedy for a constitutional violation based on police misconduct.

[] *Disbrow* did not [purport to] define the scope of the California constitutional privilege against self-incrimination now set forth at article I, section 15. In *Disbrow,* as in *People* v. *Brisendine, supra,* 13 Cal.3d 528, on which it relied, the court [] [created a new remedy for violations of *Miranda,* but did not reinterpret or extend] the scope of the substantive rights protected by the Constitution. (See *In re Lance W., supra,* 37 Cal.3d 873, 886-887.) Consequently, section 940, which relates only to substantive, not remedial, rights cannot be relied upon to save the exclusionary rule set forth in *Disbrow.*

[] [Defendant's reliance on *Ramona R.* v. *Superior Court* (1985) 37 Cal.3d 802 (210 Cal.Rptr. 204, 693 P.2d 789) is misplaced]. *Ramona R.* involved [the use of] legislatively compelled self-incriminatory statements or testimony in contrast to [using statements merely violative of *Miranda*]. In *Ramona R.* the [] [issues were] whether the juvenile court erred in failing to grant [] [the defendant] immunity from use at trial of any statements she made to her probation officer or to the court in the fitness hearing, [] [and] whether the requirement of such use immunity based on pre-Proposition 8 decisional law survived the passage of [section 28(d)]. [Our] court held that the use-immunity privilege was compelled by the California constitutional privilege against self-incrimination. That privilege was codified in [Evidence Code] section 940. It consequently was a privilege specifically exempted from the all-relevant-evidence provision of section 28(d).

Ramona, a juvenile, was charged with murder. The prosecution sought to prosecute her as an adult under the provisions of Welfare and Institutions Code section 707 []. Since the charge was one specified by section 707, subdivision (b), [] the minor was statutorily presumed [under subdivision (c)] to be unfit for juvenile court treatment. This statutory rebuttable presumption of unfitness effectively compelled the minor to produce [potentially incriminating] evidence at the fitness hearing or in her prehearing interview with a probation officer [].

[L]egislatively compelled testimony [cannot] be used against the testifier for any purpose under the federal Constitution. (*New Jersey* v. *Portash*

(1979) 440 U.S. 450, 458-459 [59 L.Ed.2d 501, 509-510, 99 S.Ct. 1292].) Testimony may be constitutionally compelled by statute only if the person testifying is protected to the same extent as if [he] had not spoken at all. Therefore, [as we explained in *Ramona R.*] the prosecution must be precluded from making any use of such testimony against that person. The scope of the immunity is as broad as the privilege against compulsory self-incrimination. [] Neither *Ramona R.* [, *supra,* 37 Cal.3d 802] nor *Portash* purports to deal with evidence seized in violation of the right against self-incrimination. They deal with the scope of the right itself rather than a remedial device to cure a constitutional violation. [] [End of Court of Appeal opinion.]

In addition to the Court of Appeal's analysis, we make the following observations which support our holding. ■■■ First, the "Truth-in-Evidence" provision of our Constitution was probably intended by the California voters as a means of (1) abrogating *judicial* decisions which had required the exclusion of relevant evidence solely to deter police misconduct in violation of a suspect's constitutional rights under the state Constitution, while (2) preserving *legislatively* created rules of privilege insulating particular communications, such as the attorney-client or physician-patient privilege. As we recently observed, "The people have apparently decided that the exclusion of evidence is not an acceptable means of implementing those rights, *except as required by the Constitution of the United States.*" (*In re Lance W., supra,* 37 Cal.3d 873, 887, italics added.)

■■■ Given the probable aim of the voters in adopting section 28(d), namely, to dispense with exclusionary rules derived solely from the state Constitution, it is not reasonably likely that the California voters intended to preserve, in the form of a "statutory" privilege, a judicially created exclusionary rule *expressly rejected* by the United States Supreme Court under the federal Constitution. (See *Harris* v. *New York, supra,* 401 U.S. 222.) In this regard, *Ramona R., supra,* 37 Cal.3d 802, is distinguishable on the further ground that its rule of use immunity was adopted in the face of conflicting signals from the federal courts regarding the necessity of such a remedy under the federal Constitution. (See 37 Cal.3d at pp. 808-809.)

Thus, it seems very likely that Proposition 8 was crafted for the very purpose, among others, of abrogating cases such as *Disbrow,* which had elevated the procedural rights of the criminal defendant above the level required by the federal Constitution, as interpreted by the United States Supreme Court. (See Ballot Pamp. arguments in favor of Prop. 8 as presented to the voters, Primary Elec. (June 8, 1982) p. 34.)

Defendant disregards the realities underlying the passage of Proposition 8 in discerning some "statutory" privilege which insulates and protects

*Disbrow.* That case neither concerned nor created any mere statutory privilege. As *Disbrow* itself unambiguously declares, "We therefore hold that the privilege against self-incrimination of article I, section 15, *of the California Constitution* precludes use by the prosecution of any extrajudicial statement by the defendant . . ." in violation of *Miranda.* (16 Cal.3d at p. 113, italics added.) We believe that section 28(d) was intended to preclude this kind of reliance on the state Constitution to create new exclusionary rules rejected by applicable decisions of the United States Supreme Court. Thus, to accept defendant's thesis would thwart the probable intent of the framers of, and voters for, Proposition 8. (See also *People* v. *Fritz* (1985) 40 Cal.3d 227, 233 [219 Cal.Rptr. 460, 707 P.2d 833] [dis. opn. by Lucas, J.]; *People* v. *Castro* (1985) 38 Cal.3d 301, 319 [211 Cal.Rptr. 719, 696 P.2d 111] [dis. opn. by Grodin, J.], 323 [dis. opn. by Lucas, J.].)

The federal rule announced in *Harris* v. *New York, supra,* 401 U.S. 222, allowing impeachment by the defendant's prior statements taken in violation of *Miranda,* may have been based on the premise that the privilege against self-incrimination cannot be invoked by one who has voluntarily taken the witness stand to testify concerning the subject matter of his prior statement. (See *People* v. *Stanfill* (1986) 184 Cal.App.3d 577, 581-582 [229 Cal.Rptr. 215], and cases cited.) As *Harris* explains, "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. *But that privilege cannot be construed to include the right to commit perjury.* [Citations.]" (401 U.S. at p. 225 [28 L.Ed.2d at p. 4], italics added.) Thus, it seems reasonable to conclude that no privilege, statutory or otherwise, protected defendant from impeachment in this case.

In addition, and contrary to the view expressed in the dissent herein, it is not reasonably likely that the voters deemed the *Disbrow* rule a "statutory rule of evidence relating to . . . *hearsay* . . ." which would be preserved under section 28(d). (Italics added.) Although the argument was neither relied on by defendant nor discussed by the parties, we briefly address it here.

 Evidence Code section 1204 recites that an otherwise admissible hearsay statement is nonetheless inadmissible in a criminal action if it was made "under such circumstances that it is inadmissible against the defendent under the Constitution of the United States or the State of California." In other words, section 1204 (in much the same manner as section 940) simply acknowledges the existence of judicial decisions under the state or federal Constitutions which bear upon the admissibility issue. As we have previously explained in the context of our analysis of section 940, in adopting section 28(d) and its exception for "statutory rules of evidence," the voters probably intended to preserve *legislatively* created evidentiary rules,

while abrogating *judicial* decisions which had required the exclusion of evidence solely on state constitutional grounds. We would wholly frustrate this intent were we to hold that the *Disbrow* rule survived merely because the Legislature had acknowledged the existence of judicial rules such as *Disbrow* in statutes such as sections 940 and 1204.

The judgment of the Court of Appeal is affirmed.

Panelli, J., and Kaufman, J., concurred.

**EAGLESON, J.—** I concur in the judgment and in the majority's holding that *Disbrow* has been abrogated by Proposition 8. However, I do not agree that *Ramona R.* was a decision that did no more than define the scope of the right against self-incrimination, since it clearly created a remedial exclusionary rule.

**MOSK, J.—**I dissent.

As I shall explain, I strongly disagree with the majority's conclusion that the rule of *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272], was nullified by article I, section 28, subdivision (d), of the California Constitution (hereinafter section 28(d)), adopted by the voters as part of Proposition 8 at the June 1982 Primary Election. I also strongly disagree with the majority's apparent approval of the rule of *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643]. Since in my opinion the voters have not compelled us to adopt *Harris,* sound reasoning compels us to adhere to *Disbrow*. Under the rule of *Disbrow* I would reverse the judgment of the Court of Appeal.

I

In *People* v. *Disbrow, supra,* 16 Cal.3d at page 113, this court held that "the privilege against self-incrimination of article I, section 15, of the California Constitution precludes use by the prosecution of any extrajudicial statement by the defendant, whether inculpatory or exculpatory, either as affirmative evidence or *for purposes of impeachment,* obtained during custodial interrogation in violation of the standards declared in *Miranda* [v. *Arizona* (1966) 384 U.S. 436 (16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 975)] and its California progeny." (Italics added.) In so holding, the court overruled *People* v. *Nudd* (1974) 12 Cal.3d 204 [115 Cal.Rptr. 72, 524 P.2d 844], in which a bare majority of this court had adopted the rule laid down by an equally bare majority of the United States Supreme Court in *Harris* v. *New York, supra,* 401 U.S. 222—i.e., that statements inadmissible as affirmative evidence because of *Miranda* violation can nevertheless be used

for impeachment if they are "voluntary"—and declared that *"Harris* is not persuasive authority in any state prosecution in California." (16 Cal.3d at p. 113.)

Evidence Code section 940 (hereinafter section 940) provides: "To the extent that such privilege exists under the Constitution of the United States or the State of California, a person has a privilege to refuse to disclose any matter that may tend to incriminate him."

Evidence Code section 1204 (hereinafter section 1204) provides: "A statement that is otherwise admissible as hearsay evidence is inadmissible against the defendant in a criminal action if the statement was made, either by the defendant or by another, under such circumstances that it is inadmissible against the defendant under the Constitution of the United States or the State of California."

Section 28(d) reads as follows: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. *Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay,* or Evidence Code, Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press." (Italics added.)

Crucial to the question whether the *Disbrow* rule survives the adoption of section 28(d) is the effect of the emphasized savings clause, and especially the meaning of its phrase, "statutory rule[s] of evidence relating to privilege or hearsay."

I begin my analysis with certain general observations. A privilege is itself not a rule of evidence but a principle of substantive law which exempts a person from the "general duty to give what testimony [he] is capable of giving . . . ." (8 Wigmore, Evidence (McNaughton ed. 1961) § 2192, p. 70 [hereinafter Wigmore]; see A Study Relating to the Privileges Article of the Uniform Rules of Evidence [hereinafter Study], Tent. Recommendation and Study Relating to the Uniform Rules of Evidence, art. V, Privileges (Feb. 1964) 6 Cal. Law Revision Com. Rep. (1964) [hereinafter Tent. Recommendation and Study] p. 309; cf. McCormick, Evidence (3d ed. 1984) § 72, p. 172 [hereinafter McCormick] ["rules of privilege are of a different order than the great bulk of evidentiary rules"].)

A privilege may grant an exemption from the duty to take the stand, as where the person involved is a criminal defendant or the spouse of a party.

(Study, *supra,* 6 Cal. Law Revision Com. Rep. at p. 309; 8 Wigmore, *supra,* at §§ 2227-2245, pp. 211-265 [spouse], § 2268, pp. 406-410 [criminal defendant]; Evid. Code, § 930 [criminal defendant], § 971 [spouse].) Or it may grant an exemption from the duty to give testimony on certain matters, such as facts that may tend to incriminate the witness or the substance of confidential communications in any of several protected relationships, including for example that of attorney and client. (Study, *supra,* at p. 309; 8 Wigmore, *supra,* § 2260, pp. 369-378 [facts tending to incriminate], §§ 2290-2329, pp. 541-641 [attorney-client communications]; Evid. Code, § 940 [facts tending to incriminate], § 954 [attorney-client communications].)

The grounds on which exemption from the duty to testify rests have nothing to do with the search for truth, but rather involve the protection of important interests and relationships. (*Fross* v. *Wotton* (1935) 3 Cal.2d 384, 394 [44 P.2d 350]; accord, McCormick, *supra,* § 72, p. 171.) Such an exemption, therefore, is not provided to benefit any party to litigation. (*Fross* v. *Wotton, supra,* at p. 394.) "It follows that the claim of privilege can be made solely by the person whose privilege it is. The privilege (as the common phrasing runs) is purely personal to himself." (8 Wigmore, *supra,* § 2196, p. 111, italics deleted.)

Even though a privilege is not itself a rule of evidence, there are rules of evidence that relate to privilege and, specifically, permit evidence to be kept from the trier of fact. Some of these rules, which allow the holder to refuse to disclose certain information (e.g., Evid. Code, § 954 [attorney-client communications]), are essentially the privilege transformed into a rule of evidence and hence are related to the privilege, as I may put it, "directly." Others, which may allow the holder to bar another from disclosing the information (e.g., *ibid.*) or may even require a person other than the holder to bar such disclosure (e.g., Evid. Code, § 955 [attorney-client communications]), operate to prevent the frustration of the policy of the privilege and hence are related to the privilege "indirectly."

I now focus my discussion on the privilege against self-incrimination in particular. I agree with the United States Supreme Court that this guarantee " 'registers an important advance in the development of our liberty— "one of the great landmarks in man's struggle to make himself civilized." ' " [Citation.] It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates 'a fair state-individual

balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load,' [citation]; our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life,' [citation]; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a· shelter to the guilty,' is often 'a protection to the innocent.'" (*Murphy* v. *Waterfront Comm'n.* (1964) 378 U.S. 52, 55 [12 L.Ed.2d 678, 681-682, 84 S.Ct. 1594], fn. omitted; accord, *People* v. *Coleman* (1975) 13 Cal.3d 867, 875, fn. 5 [120 Cal.Rptr. 384, 533 P.2d 1024]; see generally *People* v. *Bernal* (1967) 254 Cal.App.2d 283, 288-294 [62 Cal.Rptr. 96].)

In view of these policies, the privilege "must be accorded liberal construction in favor of the right it was intended to secure." (*Hoffman* v. *United States* (1951) 341 U.S. 479, 486 [95 L.Ed. 1118, 1124, 71 S.Ct. 814], and cases cited.) In other words, it "must not be interpreted in a hostile or niggardly spirit." (*Ullmann* v. *United States* (1956) 350 U.S. 422, 426 [100 L.Ed. 511, 518, 76 S.Ct. 497, 53 A.L.R.2d 1008].) The reason for this is plain: "To apply the privilege narrowly or begrudgingly—to treat it as an historical relic, at most merely to be tolerated—is to ignore its development and purpose." (*Quinn* v. *United States* (1955) 349 U.S. 155, 162 [99 L.Ed. 964, 972, 75 S.Ct. 668, 51 A.L.R.2d 1157]; accord, *Board of Education* v. *Mass* (1956) 47 Cal.2d 494, 503 [304 P.2d 1015] (conc. opn. of Carter, J.).)

Moving from the topic of privilege, I make the following general observations on the law of hearsay. Under the Evidence Code, "'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. [¶] . . . Except as provided by law, hearsay evidence is inadmissible." (*Id.,* § 1200, subds. (a) and (b).) Under the code, confessions and admissions constitute an exception to the rule. (*Id.,* § 1220.)

I proceed now to the heart of my analysis. Section 940, which is quoted above, declares that a person has a privilege against self-incrimination "To the extent that such privilege exists under the Constitution of the United States or the State of California . . . ."

This important statute does two things. First, it makes into a rule of statutory substantive law the privilege against self-incrimination that is enshrined in the federal and state constitutions as construed by the courts. As the Law Revision Commission comment explains: "Section 940 does not determine the scope of the privilege against self-incrimination; the scope of the privilege is determined by the pertinent provisions of the California and

United States Constitutions *as interpreted by the courts.* [Citations.] Nor does Section 940 prescribe the exceptions to the privilege or indicate when it has been waived. *This, too, is determined by the cases interpreting the pertinent provisions of the California and United States Constitutions.*" (Recommendation Proposing an Evidence Code (Jan. 1965) 7 Cal. Law Revision Com. Rep. (1965) p. 170, italics added [hereinafter Recommendation]; accord, *People* v. *Barrios* (1985) 166 Cal.App.3d 732, 743 [212 Cal.Rptr. 644]; *Wilson* v. *Superior Court* (1976) 63 Cal.App.3d 825, 829-830 [134 Cal.Rptr. 130]; see generally Note, *Disbrow Confronts Proposition 8: Will Miranda Violative Statements Be Admitted to Trial for Impeachment?* (1986) 17 Pacific L.J. 1337, 1347-1356 [hereinafter Note, *Disbrow Confronts Proposition 8*].)

Second, section 940—which is, of course, a provision of the *Evidence Code*—impliedly codifies the rules of evidence laid down by the courts as they have interpreted the privilege. (See *People* v. *Weaver* (1985) 39 Cal.3d 654, 659 [217 Cal.Rptr. 245, 703 P.2d 1139]; *Ramona R.* v. *Superior Court* (1985) 37 Cal.3d 802, 808-811 [210 Cal.Rptr. 204, 693 P.2d 789]; *People* v. *Marzett* (1985) 174 Cal.App.3d 610, 617-619 [220 Cal.Rptr. 217]; *People* v. *Clark* (1985) 171 Cal.App.3d 889, 893-894 [217 Cal.Rptr. 819]; *People* v. *Navarez* (1985) 169 Cal.App.3d 936, 942-945 [215 Cal.Rptr. 519]; *People* v. *Givans* (1985) 166 Cal.App.3d 793, 800 [212 Cal.Rptr. 762]; *People* v. *Barrios, supra,* 166 Cal.App.3d at pp. 739-746; *People* v. *Jacobs* (1984) 158 Cal.App.3d 740, 750-751 [204 Cal.Rptr. 849].) The Attorney General, in substance, admits as much: in the June 10, 1982, supplement to his Guide to Proposition 8 (1982), he states that "Section 940 is a statutory rule of evidence relating to privilege deriving content from both the state and federal constitutions." (*Id.* at p. 4-52.)

Section 1204, which is quoted above, declares that "A statement that is otherwise admissible as hearsay evidence is inadmissible against the defendant in a criminal action if the statement was made . . . under such circumstances that it is inadmissible against the defendant under the Constitution of the United States or the State of California." As the Law Revision Commission comment explains: "Section 1204 is statutory recognition that hearsay evidence that fits within an exception to the hearsay rule may nonetheless be inadmissible under the Constitution of the United States or the Constitution of California." (Recommendation, *supra,* 7 Cal. Law Revision Com. Rep., p. 226.) Thus under section 1204 confessions and admissions, which fit within the exception to the hearsay rule defined in Evidence Code section 1200, are nonetheless inadmissible for any purpose under the state constitution as construed in *Disbrow* if they were obtained during custodial interrogation in violation of the standards declared in *Miranda.* In short, section 1204 impliedly codifies the rule of *Disbrow* as a rule of

evidence relating to hearsay—specifically, it establishes that rule as an exception to the confession-admission exception to the hearsay rule.

From the foregoing analysis it follows that through the operation of each of two separate statutory provisions the *Disbrow* rule falls within the savings clause of section 28(d) and hence outside the scope of the general declaration of that provision.

First, section 940 codifies, and thereby establishes as statutory rules, those rules of evidence that the courts have articulated relating to the constitutional privilege against self-incrimination. In construing article I, section 15, of the California Constitution this court laid down the rule of *Disbrow* as such a rule. Therefore, section 940 establishes that rule as a statutory rule relating to the privilege against self-incrimination.

Second, section 1204 codifies, and thereby establishes as statutory rules relating to hearsay, those rules that render inadmissible on constitutional grounds hearsay evidence that is otherwise admissible. In construing article I, section 15, of the California Constitution, this court laid down the rule of *Disbrow* as such a rule. Therefore, section 1204 establishes that rule as a statutory rule relating to hearsay.

As previously concluded by Courts of Appeal (*People* v. *Marzett, supra,* 174 Cal.App.3d at pp. 617-619; *People* v. *Clark, supra,* 171 Cal.App.3d at pp. 892-894; *People* v. *Barrios, supra,* 166 Cal.App.3d at pp. 736-747), and by commentators (Note, *Disbrow Confronts Proposition 8, supra,* 17 Pacific L.J. at pp. 1345-1360), I would therefore hold that section 28(d) does not nullify the *Disbrow* rule.

In support of their conclusion to the contrary, the majority reason in substance that the intent of those who drafted and voted for section 28(d) was to abrogate judicial decisions requiring the exclusion of evidence solely on state constitutional grounds, and that such an intent would be frustrated if the savings clause were read in accordance with the plain meaning of its words. In my view, this analysis is devoid of persuasive force. To judge from the words they used, the drafters of section 28(d) must have intended at most to nullify state constitutional exclusionary rules that operated independently of statutory provisions and were therefore proof against amendment or repeal through the ordinary legislative process. If, as the majority assert, the drafters had intended to blanketly abrogate judicially-declared exclusionary rules, they would surely have used words to that effect. Thus, since the premise of the majority's reasoning is unsupported, its conclusion must be rejected. Accordingly, I am compelled to give the savings clause the straightforward reading that its plain words require.

In an attempt to show that the *Disbrow* rule does not fall within the savings clause of section 28(d) as a statutory rule relating to privilege, the majority frame an argument that relies on *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744], and runs in essence as follows: section 28(d) declares generally that "relevant evidence shall not be excluded in any criminal proceeding"; the savings clause exempts section 940 and consequently the *substance* of article I, section 15, from the operation of the provision, but not "remedies"—such as, assertedly, the *Disbrow* rule—created by the courts under the state Constitution; thus, in its broad sweep section 28(d) impliedly abrogates the *Disbrow* rule. The argument is without merit.

To begin with, *In re Lance W.* is plainly inapposite. There, the court was dealing—expressly—only with search and seizure provisions of the Constitution, which do not in precise terms confer on a person a right to exclude evidence and arguably do not come within the savings clause of section 28(d). (*In re Lance W., supra,* 37 Cal.3d at p. 885, fn. 4.) Here, by contrast, we are dealing with the privilege against self-incrimination, which *necessarily* confers a right to exclude (see, e.g., *People* v. *Rucker* (1980) 26 Cal.3d 368, 390 [162 Cal.Rptr. 13, 605 P.2d 843]; *People* v. *Disbrow, supra,* 16 Cal.3d at p. 113; Dershowitz & Ely, *Harris* v. *New York: Some Anxious Observations on the Candor and Logic of the Emerging Nixon Majority* (1971) 80 Yale L.J. 1198, 1214 [hereinafter Dershowitz & Ely]), and indisputably comes within the savings clause.

More important, however, the argument is manifestly unsound. Whereas *In re Lance W.* held that the search and seizure provisions of the state Constitution are within the broad sweep of the general declaration of section 28(d), the privilege against self-incrimination comes within the savings clause. Under that clause are retained not merely section 940 and the substance of article I, section 15. Also retained—*expressly*—are "statutory rule[s] of evidence relating to privilege." As I have explained, among such rules is included, through operation of section 940, the rule laid down in *Disbrow.*

Because the language of section 28(d) is clear and unambiguous on this matter at least, a court has no need to engage in constitutional interpretation and should not indulge therein. (*In re Lance W., supra,* 37 Cal.3d at p. 886.) Yet if a court could properly look to the ballot summaries and arguments, which "are accepted sources from which to ascertain the voters' intent and understanding of initiative measures" (*id.* at p. 888, fn. 8), it would arrive at the same conclusion: nowhere in those materials is the privilege even alluded to. If a court could properly cast its gaze further and consider the debate that raged over Proposition 8 in both legal circles and

the community as a whole, it would not arrive at a different conclusion. In view of the multitude of altogether divergent and in many cases extravagant interpretations put forward, such materials are of dubious value: they provide at least some support to all constructions, no matter how extreme and inherently unreasonable.

But even if a court were allowed to construe section 28(d) on this point, it certainly could not adopt the majority's interpretation. The "right/remedy" distinction is neither implied in the words of the provision nor suggested by any extrinsic aids. More important, perhaps, the distinction appears alien to the law of privilege. Whatever its validity in search-and-seizure jurisprudence—in which the constitutional guarantee is generally believed not to require the exclusion of evidence—the "right/remedy" distinction seems peculiarly out of place in the law of the privilege against self-incrimination—which, as I have observed, necessarily bars admission of certain evidence.

Thus, section 28(d) has not nullified the rule of *Disbrow*.

## II

If I were to reconsider *Disbrow, supra,* 16 Cal.3d 101, I would adhere to its rule, and reject the rule of *Harris, supra,* 401 U.S. 222, for the following reasons.

## A

First, in formulating the *Disbrow* rule the court proceeded cautiously and deliberately. I would therefore be reluctant to depart from the holding of that decision and the analysis on which it is based.

The *Disbrow* court began its discussion as follows: "In *Harris* . . . the Supreme Court held that statements which were inadmissible as affirmative evidence because of a failure to comply with *Miranda* could nevertheless be used for impeachment purposes to attack the credibility of a defendant's trial testimony, as long as the statements were not 'coerced' or 'involuntary.' . . . [¶] In *People* v. *Nudd* (1974) 12 Cal.3d 204, 208 [115 Cal.Rptr. 372, 524 P.2d 844], a bare majority of this court 'adopted' the *Harris* rationale as the law in California. [¶] In the present case we reexamine *Nudd* and its uncritical acceptance of the *Harris* rationale." (16 Cal.3d at pp. 106-107.)

For the following five reasons the *Disbrow* court found the *Harris-Nudd* rule wanting. First, it determined that the authority relied on in *Harris*

itself, i.e., the general availability of an "impeachment exception" to the Fourth Amendment's exclusionary rule, was insufficient to support the rule. (*Id.* at pp. 107-110.)

Second, it was the view of the *Disbrow* court that persuasive language in the *Miranda* opinion supports a position contrary to the *Harris-Nudd* rule. (*Id.* at p. 106.) In *Miranda* the Supreme Court stated: "The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant. No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. *In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication.* These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement." (384 U.S. at pp. 476-477 [16 L.Ed.2d at p. 725], italics added.)

The *Disbrow* court concluded, moreover, that "there are compelling reasons to disregard *Nudd* contained in the *ratio decidendi* of *Miranda*." (16 Cal.3d at p. 110.) It reasoned: "In *People* v. *Fioritto* (1968) . . . 68 Cal.2d 714, 717 [68 Cal.Rptr. 817, 441 P.2d 625], we said, 'A principal objective of [*Miranda*] was to establish safeguards that would liberate courts insofar as possible from the difficult and troublesome necessity of adjudicating in each case whether coercive influences, psychological or physical, had been employed to secure admissions or confessions.' The precision with which the *Miranda* court established not simply broad procedural guidelines but a precise manual for the conducting of custodial interrogations can be interpreted only as expressing an intention to create a single, uncomplicated, universally applicable test for determining whether a particular confession was coerced. If proper warnings are given voluntariness is assured, at least in the absence of 'traditional' coercion. Conversely, if an accused is inadequately informed of his rights involuntariness is assumed, and the statements are inadmissible at trial.

"The *Harris-Nudd* rule would resurrect the remains of the earlier voluntariness test. Neither case by its terms would allow impeachment by use of

statements which are 'coerced or involuntary.' [Citations.] Thus under *Harris-Nudd* the following scenario can be anticipated: a defendant will testify in a manner the prosecution considers contrary to his extrajudicial statement. The defendant will contend that the statement is involuntary under one of the myriad pre-*Miranda* definitions of that term. It will then be necessary to interrupt the proceedings, not only at mid-trial but at mid-examination, for an evidentiary hearing, the outcome of which will be subject to later review on appeal. Only if the statement is ruled voluntary will it be admissible to impeach. In time there will arise an impressive body of law on the voluntariness issue, rivaling that which presently exists in the area of search and seizure, as various appellate courts grapple on a case-by-case basis with the question of what is an involuntary statement. This, we feel, is precisely the evidentiary thicket *Miranda* was designed to avoid." (*Disbrow, supra,* 16 Cal.3d at pp. 111-112, fns. omitted.)

The *Disbrow* court's third reason for finding the *Harris-Nudd* rule wanting was its belief that there was "considerable potential that a jury, even with the benefit of a limiting instruction, will view prior inculpatory statements as substantive evidence of guilt rather than as merely reflecting on the declarant's veracity. The theory of a limiting instruction loses meaning in this context. . . . To instruct a jury that they are not to consider expressions of complicity in the charged crime as evidence that the speaker in fact committed the charged crime, but only for the purpose of demonstrating that he was probably lying when he denied committing the charged crime, would be to require, in the words of Learned Hand, 'a mental gymnastic which is beyond, not only [the jury's] power, but anybody else's.' [Citation.] It is thus clear that a defendant faced with the prospect of the jury hearing his admittedly illegally obtained confession if he testifies in his own behalf will be under considerable pressure to forego this most basic right of an accused. Such a result is certainly not what *Miranda* envisaged." (*Id.* at p. 112.)

Fourth, the *Disbrow* court determined that "to permit admissibility leaves little or no incentive for police to comply with *Miranda's* requirements. . . . In a case of notoriety with little independent evidence there may be irresistible pressures on law enforcement personnel to secure a confession. If it is known that statements elicited in violation of *Miranda* may nevertheless be introduced at some point in the trial there would exist no sanction whatever against the use of overbearing interrogatory techniques, at least until the practices approached traditional levels of coercion." (*Id.* at p. 113.)

Finally, the *Disbrow* court was persuaded of the unsoundness of the *Harris-Nudd* rule "by a significant rationale of the exclusionary rule itself.

In *People* v. *Cahan* (1955) 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513], the landmark case in which this court adopted the rule for California two decades ago, we said, 'the success of the lawless venture depends entirely on the court's lending its aid by allowing the evidence to be introduced. . . . Out of regard for its own dignity as an agency of justice and custodian of liberty the court should not have a hand in such "dirty business." ' " (*Id.* at p. 113, fn. omitted.)

Thus, it was only after the *Disbrow* court carefully reexamined the *Harris*-*Nudd* rule that it enunciated, under the state constitutional privilege against self-incrimination, what has come to be known as the *Disbrow* rule and accordingly "overrule[d] *Nudd* and declare[d] that *Harris* is not persuasive authority in any state prosecution in California." (*Id.* at p. 113.)

### B

My second major reason for adhering to the rule of *Disbrow* is my continuing conviction that the reasoning underlying the *Harris* rule is insufficient and altogether unpersuasive. The *Harris* opinion, as is commonly recognized, has been "heavily criticized." (Comment, *The Impeachment Exception to the Constitutional Exclusionary Rules* (1973) 73 Colum.L.Rev. 1476, 1481; accord, 4 LaFave, Search and Seizure (2d ed. 1987) § 11.6(a), p. 485 [hereinafter LaFave]; see, e.g., Dershowitz & Ely, *supra*, 80 Yale L.J. 1198; Note, *The Supreme Court, 1970 Term, Admissibility of Unlawfully Obtained Statement for Impeachment Purposes* (1971) 85 Harv.L.Rev. 3, 44-53 [hereinafter Note, *Admissibility*].) As I shall explain, I am compelled to agree with that criticism and to join in Professor LaFave's general assessment: "The majority opinion in *Harris* is an incredibly bad one, fully deserving the harsh comments which have been made in reaction to it. The result is a most unfortunate one . . . . Perhaps even more significant, however, is the fact that the opinion is an almost unbelievably bad piece of judicial craftsmanship. The majority opinion in *Harris* not only misrepresented the record in the case before it, but also misstated the existing law . . . ." (4 LaFave, *supra*, § 11.6(a), p. 485, fns. omitted.)

To begin with, as the *Disbrow* court strongly suggested, the *Harris* majority's treatment of precedent is unsound. (Comment (1971) 39 Geo.Wash.L.Rev. 1241, 1245; see, e.g., Dershowitz & Ely, *supra*, 80 Yale L.J. at pp. 1208-1218; Note, *Admissibility, supra*, 85 Harv.L.Rev. at pp. 45-53.) The point is perhaps clearest insofar as *Miranda, supra*, 384 U.S. 436, is involved.

Before entering on its lengthy and precise analysis, the *Miranda* court summarized its conclusion in the following words. "Our holding will be

spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (384 U.S. at p. 444 [16 L.Ed.2d at p. 706].)

Prior to *Harris,* both federal and state appellate courts had with virtual unanimity interpreted *Miranda* to bar the prosecution from using statements obtained in violation of its rule for the purpose of impeachment. (*United States* v. *Fox* (2d Cir. 1968) 403 F.2d 97; *United States* v. *Pinto* (3d Cir. 1968) 394 F.2d 470; *Breedlove* v. *Beto* (5th Cir. 1968) 404 F.2d 1019; *Groshart* v. *United States* (9th Cir. 1968) 392 F.2d 172; *Blair* v. *United States* (D.C.Cir. 1968) 401 F.2d 387; *Wheeler* v. *United States* (10th Cir. 1967) 382 F.2d 998; *People* v. *Barry* (1965) 237 Cal.App.2d 154 [46 Cal.Rptr. 727], cert. den. (1967) 386 U.S. 1024 [18 L.Ed.2d 464, 875 S.Ct. 1382]; *Velarde* v. *People* (1970) 171 Colo. 261 [466 P.2d 919]; *State* v. *Galasso* (Fla. 1968) 217 So.2d 326; *People* v. *Luna* (1967) 37 Ill.2d 299 [226 N.E.2d 586]; *Franklin* v. *State* (1969) 6 Md.App. 572 [252 A.2d 487]; *People* v. *Wilson* (1969) 20 Mich.App. 410 [174 N.W.2d 79]; *State* v. *Catrett* (1970) 276 N.C. 86 [171 S.E.2d 398]; *State* v. *Brewton* (1967) 247 Ore. 241 [422 P.2d 581], cert. den. 387 U.S. 943 [18 L.Ed.2d 1328, 87 S.Ct. 2074]; *Commonwealth* v. *Padgett* (1968) 428 Pa. 229 [237 A.2d 209]; *Spann* v. *State* (Tex.Crim. 1969) 448 S.W.2d 128; *Cardwell* v. *Commonwealth* (1968) 209 Va. 412 [164 S.E.2d 699]; *Gaertner* v. *State* (1967) 35 Wis.2d 159 [150 N.W.2d 370]; contra, *State* v. *Kimbrough* (1970) 109 N.J. Super. 57 [262 A.2d 232]; *State* v. *Butler* (1969) 19 Ohio St.2d 55 [48 Ohio Ops.2d 77, 249 N.E.2d 818]; *State* v. *Grant* (1969) 77 Wn.2d 47 [459 P.2d 639].)

In *Harris,* however, the majority summarily dismissed the *Miranda* holding in the first paragraph of its cursory two-page analysis: "Some comments in the *Miranda* opinion can indeed be read as indicating a bar to use of an uncounseled statement for any purpose, but discussion of that issue was not at all necessary to the Court's holding and cannot be regarded as controlling. *Miranda* barred the prosecution from making its case with statements of an accused made while in custody prior to having or effectively waiving counsel. It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." (401 U.S. at p. 224 [28 L.Ed.2d at p. 4].)

In the words of one commentator, "Although dismissing [this language] as dictum . . . the Court in *Harris* does not directly confront the reasoning of *Miranda.*" (Note, *Admissibility, supra,* 85 Harv.L.Rev. at pp. 46-47.)

Specifically, as Professors Dershowitz and Ely explain in the leading scholarly treatment of *Harris*: "This summary of *Miranda* is misleading in two respects. First, by stating that 'some' comments 'can . . . be read' to preclude the *Harris* result, the [Court] suggests that that is but one of several possible readings. However, a pervasive and unambiguous aspect of *Miranda* was its explicit rejection of distinctions based on the manner in which a statement is used by the Government or the degree to which it is helpful to it . . . . *Miranda*'s repeated references to 'exculpatory' statements were thus intended to cover precisely the kind of statement at issue in *Harris* and the specific use to which it was there put. Nor did these references pass unnoticed. They were the object of explicit and uncomplimentary reference in each of the three dissents filed in *Miranda*. Accordingly, *Miranda* not only 'can' be read to require reversal of Harris's conviction, it can be read no other way!

"Second, it is of course technically accurate to say that *Miranda*'s discussion of impeachment was not necessary to the Court's holding, since the statements in *Miranda* had been used as part of the prosecution's case in chief. But *Miranda* did not purport to be an opinion limited to its precise facts. . . . *Miranda* purported to 'give concrete constitutional guidelines for law enforcement agencies and courts to follow.' . . . Moreover, the opinion *said* that it was part of its 'holding' that an uncounseled 'exculpatory' statement could not be used by the prosecution." (Dershowitz & Ely, *supra*, 80 Yale L.J. at pp. 1209-1210, italics in original, fns. omitted.)

Not only is the *Harris* majority's treatment of precedent unsound, their policy arguments are unconvincing as well. The first runs as follows: "the benefits of [the impeachment] process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." (401 U.S. at p. 225 [28 L.Ed.2d at p. 4].)

I believe that if the benefit that flows from the use of statements obtained in violation of *Miranda* is placed into one pan of the balance and the deterrent effect of a broad exclusionary rule is placed into the other, the latter clearly outweighs the former. First, the use of illegally obtained statements is of little marginal benefit to the prosecution in cross-examining a criminal defendant. From my review of the thousands of criminal matters that come before the court each year, I am convinced that the arsenal the skillful prosecutor has at his disposal for use in cross-examination is more than sufficient for the task and is not significantly affected by the presence or absence of illegally obtained statements.

Moreover, the *Harris* rule does not carry sufficient deterrence. In cases in which the police believe they can obtain the evidence they seek only by violating the law, the *Harris* rule practically invites unlawful conduct by allowing the prosecution to use the evidence for impeachment. By contrast, a broad exclusionary rule deters such improper police conduct by denying the prosecution any benefit that might flow therefrom.

The harm threatened by the *Harris* rule has not escaped the notice of commentators. One has asserted that *"Harris* permits law enforcement officials to obtain confessions or statements directly related to the issue of guilt by illegal means and hold such evidence as a warning to the accused not to take the stand and contradict his prior utterance." (Comment, *supra,* 39 Geo.Wash.L.Rev. at p. 1246.) Why the police may act in this fashion is plain: "it is widely acknowledged that a defendant—at least one without a criminal record—who takes the witness stand and tells his story has a considerably better chance of acquittal than one who stands mute." (Dershowitz & Ely, *supra,* 80 Yale L.J. at p. 1220, citing authorities.)

Professors Dershowitz and Ely also observe that "The *Miranda* situation is . . . tailor-made for a sequential 'try it legally—if you fail, try it illegally' approach. That is, the police can attempt to obtain a statement admissible in the case in chief by giving the required warnings. If, however, the suspect requests a lawyer, they can then (instead of honoring the request and thereby losing the statement) go on—given *Harris*—to try for an uncounselled statement to use for impeachment." (Dershowitz & Ely, *supra,* 80 Yale L.J. at p. 1220, fn. 90.)

Still another commentator explains, *"Harris* is likely to undercut substantially *Miranda*'s prophylactic effect. The deterrent effect of *Miranda* depends primarily on whether statements obtained without giving *Miranda* warnings are of value to the police or prosecution. Before *Harris,* it was generally thought that an unwarned statement could not be used in any manner in a prosecution of the suspect. After *Harris,* police disregard of *Miranda,* if it results in an incriminating statement by the suspect, will give the prosecution a considerable advantage. If authorities can produce enough independently obtained evidence to get to the jury—not a difficult task given the reluctance of most judges to dismiss on motion for acquittal—the defendant who has made an unwarned statement to the police will be placed in a dilemma. If he does not take the stand, he runs a substantial risk of being convicted; the jury, suspicious of his failure to explain events that are presumably within his knowledge, may conclude that the defendant has something to hide and infer that he is guilty of the crime charged. Yet if he does choose to testify in his own behalf, he risks impeachment by the unlawfully obtained and possibly unreliable statement. In either case, once

an incriminating statement is obtained, conviction may be likely. By thus restoring the value of statements obtained without warning suspects of their rights, *Harris* may well encourage police to ignore *Miranda*." (Note, *Admissibility, supra,* 85 Harv.L.Rev. at pp. 51-52, fns. omitted.)

Regrettably, the fear that *Harris* may encourage unlawful police conduct has been fulfilled. "During the period [when *Harris-*]*Nudd* controlled, there appeared to be a marked increase in police interrogation after a defendant had invoked his right to silence. Undoubtedly, the police recognized that such a practice could only be beneficial. If the police ceased questioning the defendant, there would be no statement; continuing the interrogation might lead to an admission which would hamper the suspect's ability to testify in his defense at trial." (Simons, *California's Rule of Vicarious Exclusion: Who May Challenge the Constable's Errors?* (1979) 19 Santa Clara L.Rev. 319, 327, fn. omitted.)

The second policy argument relied on by the *Harris* majority is as follows. "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury." (401 U.S. at p. 225 [28 L.Ed.2d at p. 4].)

But as Professors Dershowitz and Ely have explained, "the entire argument is a straw man. Of course a defendant has no 'right to commit perjury.' But this was hardly [Harris's] argument. Neither does a defendant have the right to commit murder, and yet the Government may not prove that crime by means of an illegally obtained statement. Nor, indeed, could it introduce such a statement as part of its case in chief in a perjury prosecution. Whether it should be permitted to use it to prove perjury in the context of a trial for a different crime is the question, and it is not answered by denying that there is a right that no one asserted. [¶] The real issue, never addressed by the Court, is where to strike the balance between the state's interest in challenging the defendant's credibility and the defendant's interest in excluding illegally secured evidence." (80 Yale L.J. at pp. 1222-1223.)

The balance, I believe, must be struck in favor of the defendant: the statement at issue has, by definition, been obtained in violation of the defendant's *Miranda* rights; if the prosecution is precluded from using such evidence for impeachment, it is not significantly disadvantaged in undertaking its cross-examination.

The *Harris* majority's final argument runs as follows: "Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of

cross-examination and impeachment." (401 U.S. at pp. 225-226 [28 L.Ed.2d at p. 5].) The point is simply immaterial. Of course "inconsistent statements . . . made by the accused to some third person . . . could . . . be laid before the jury by way of cross-examination and impeachment"—and indeed could also be laid before them in the prosecution's case in chief. The reason for this is plain: the Fifth Amendment does not apply to statements made to private persons. The statements at issue here, however, were made to the *police,* and are thus within the scope of the privilege against self-incrimination.

For the foregoing reasons I would reject the rule of *Harris* and would adhere to the rule of *Disbrow.*[1]

## III

Under *Disbrow,* as the facts stated by the majority show, the ruling that defendant's statements were admissible for impeachment was error.

The trial court correctly concluded, and the Attorney General concedes, that the statements were obtained in violation of *Miranda.* As this court has said, "It is beyond dispute that once a defendant has asserted his right to counsel the interrogation must cease." (*People* v. *Braeseke* (1979) 25 Cal.3d 691, 702 [159 Cal.Rptr. 684, 602 P.2d 384].) Or as the United States Supreme Court has declared, "If [the defendant] requests counsel, 'the interrogation must cease until an attorney is present.' " (*Edwards* v. *Arizona* (1981) 451 U.S. 477, 482 [68 L.Ed.2d 378, 384, 101 S.Ct. 1880], quoting *Miranda* v. *Arizona, supra,* 384 U.S. at p. 474 [16 L.Ed.2d at p. 723].) It is clear from the record that immediately after being advised of his *Miranda* rights defendant requested an attorney: he said, "Before I answer a thing I would want an attorney present here . . . ." In spite of this express invocation of the right to counsel, the police continued their interrogation and obtained the statements at issue. Because those statements were obtained "during custodial interrogation in violation of the standards declared in *Miranda*

---

[1] In their apparent approval of the *Harris* rule, the majority manifest an implied disapproval of *Miranda.* In such disapproval, they not only take a position that is contrary, as shown above, to the logic and practical wisdom of that decision. They also put themselves at odds with the opinion of the overwhelming majority of the legal profession. According to a recent poll conducted on behalf of the American Bar Association, "The *Miranda* rule . . . enjoys the strong support of American lawyers. Nearly four lawyers in five (79 percent) think the Supreme Court was right to establish the rule, and only 14 percent disagree." (*Lawpoll* (Oct. 1, 1987) ABA Journal, at p. 26.) Among those who support *Miranda* is William Sessions, Director of the Federal Bureau of Investigation. The *Miranda* rule, he has stated, "is always an imposition of initial burden upon law enforcement people, but I am convinced that the burden is an appropriate one." (Quoted in *Topics of the Times: Crime and the Constitution,* New York Times (Nov. 5, 1987) p. A34, col. 2.)

and its California progeny," the privilege against self-incrimination of the California Constitution precluded the prosecution from using them for any purpose whatsoever. (*People* v. *Disbrow, supra,* 16 Cal.3d at p. 113.) The trial court, therefore, erred in ruling defendant's extrajudicial statements admissible for purposes of impeachment.

But because defendant did not testify, the prejudicial effect of the error cannot intelligently be weighed. To allow such review I would reverse the judgment with directions to permit defendant to make an offer of proof as to what his testimony would have been had he taken the stand, and then to weigh prejudice under the test of *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243], by determining whether it is reasonably probable that the error affected the result. (Cf. *People* v. *Collins* (1986) 42 Cal.3d 378, 393-395 [228 Cal.Rptr. 899, 722 P.2d 173] [*Castro* error].)

For the foregoing reasons, I dissent.

Broussard, J., and Arguelles, J., concurred.

Appellant's petition for a rehearing was denied April 7, 1988. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.